Sealed

Public and unofficial staff access to this instrument are prohibited by court order

United States Courts
Southern District of Texas
FILED

*April 30, 2024*

Nathan Ochsner, Clerk of Court

## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | CRIMINAL NO. **4:24-cr-00224** |
| v. | VIOLATIONS: |
| ENRIQUE ROBERTO "HENRY" CUELLAR, | 18 U.S.C. § 371 (Conspiracy) |
| | 18 U.S.C. § 201(b) (Bribery) |
| and | 18 U.S.C. § 1349 (Honest Services Wire Fraud Conspiracy) |
| IMELDA RIOS CUELLAR, | 18 U.S.C. § 219 (Public Official Acting as an Agent of a Foreign Principal) |
| | 18 U.S.C. § 1956(h) (Money Laundering Conspiracy) |
| Defendants. | 18 U.S.C. § 1956(a)(1)(B)(i) (Money Laundering) |
| | 18 U.S.C. § 2 (Aiding and Abetting) |

## <u>I N D I C T M E N T</u>

The Grand Jury charges that, at all times relevant to this Indictment, unless otherwise set forth, with all dates and times alleged to be "on or about" or "in or around" and all amounts alleged to be "approximately":

### INTRODUCTION

#### *Overview*

1.      Since 2005, ENRIQUE ROBERTO "HENRY" CUELLAR has represented Texas's 28th Congressional District in the United States House of Representatives. Beginning in at least December 2014 and continuing through at least November 2021, HENRY CUELLAR and his wife, IMELDA RIOS CUELLAR, agreed to and did accept at least $598,000 in bribes from two foreign entities: Foreign Oil Company-1, an oil and gas company wholly owned and controlled by the Government of Azerbaijan, and Foreign Bank-1, a bank headquartered in Mexico City,

Mexico.  The bribe payments were laundered, pursuant to sham consulting contracts, through a series of front companies and middlemen into shell companies owned by IMELDA CUELLAR. IMELDA CUELLAR performed little or no legitimate work under the sham contracts.  Instead, in exchange for the bribe payments to IMELDA CUELLAR, HENRY CUELLAR agreed to perform official acts in his capacity as a Member of Congress, to commit acts in violation of his official duties, and to act as an agent of the Government of Azerbaijan and Foreign Bank-1.

2.      Pursuant to these corrupt agreements, HENRY CUELLAR promised to use the power and prestige of his office to advance Azerbaijan's and Foreign Bank-1's interests in the United States.  With respect to Azerbaijan, in exchange for the bribe payments, HENRY CUELLAR promised to influence U.S. foreign policy in favor of Azerbaijan.  HENRY CUELLAR agreed, among other things, to influence a series of legislative measures relating to Azerbaijan's conflict with neighboring Armenia; to insert language favored by Azerbaijan into legislation and committee reports governing certain security and economic aid programs; to deliver a pro-Azerbaijan speech on the floor of the House of Representatives; and to consult with representatives of Azerbaijan regarding their efforts to lobby the United States government.

3.      With respect to Foreign Bank-1, in exchange for the bribe payments, HENRY CUELLAR promised to influence federal regulation of the financial industry to benefit Foreign Bank-1 and its affiliates.  Specifically, HENRY CUELLAR agreed, among other things, to influence legislative activity and to advise and pressure Executive Branch officials regarding anti-money laundering enforcement practices that threatened Foreign Bank-1's business interests; to support legislation to block federal regulation of the payday lending industry; and to support revisions to the criminal money-laundering statutes favored by the Mexican corporate conglomerate of which Foreign Bank-1 was a member.

***Background on HENRY and IMELDA CUELLAR***

4.      HENRY CUELLAR was elected to the United States House of Representatives in 2004 and was re-elected nine times, most recently in 2022.  His district stretches from the suburbs of San Antonio to the U.S.-Mexico border and includes the city of Laredo, Texas.  As a United States Congressman, HENRY CUELLAR owes a fiduciary duty to the United States and to the residents of Texas's 28th Congressional District to provide honest services and to perform the duties and responsibilities of his office free from corrupt influence.  Since 2013, HENRY CUELLAR has held a seat on the House Committee on Appropriations ("Appropriations Committee"), which is responsible for appropriating funding for most of the functions of the United States government.  As such, HENRY CUELLAR wields influence over a wide variety of federal policy and budgetary issues.

5.      HENRY CUELLAR has been married to IMELDA CUELLAR since 1992.  IMELDA CUELLAR was employed as a Tax Enforcement Officer at the Texas Office of the State Comptroller for approximately 25 years until her retirement in 2012.

6.      Relative-1 is an adult child of HENRY and IMELDA CUELLAR.

7.      Shell Company-1 was incorporated under the laws of the State of Texas on April 17, 2012.  On September 23, 2014, IMELDA CUELLAR converted Shell Company-1 to a limited liability company.  IMELDA CUELLAR is its sole owner.

8.      Shell Company-2 is a limited liability company formed under the laws of the State of Texas on November 13, 2017.  It is 60% owned by IMELDA CUELLAR, 20% by Relative-1, and 20% by another adult child of HENRY and IMELDA CUELLAR.

9.      Shell Company-3 is a limited liability company formed under the laws of the State of Texas on April 30, 2021, and is owned by Relative-1.

### *The Foreign Agents Registration Act*

10.     The Foreign Agents Registration Act ("FARA"), 22 U.S.C. § 611 *et seq*., is a federal registration and disclosure statute that requires any person who agrees to act or acts in the United States as an "agent of a foreign principal" to register with the United States Attorney General if he or she agrees to engage or engages, directly or through another person, in certain types of conduct, such as political activities, political consulting, public relations, or publicity activities, for or in the interest of the foreign principal.  Such registrations are made to the National Security Division's FARA Unit within the U.S. Department of Justice.  The purpose of FARA is to prevent covert influence by foreign principals, as proper registration under the statute allows the United States Government and the American people to evaluate the statements and activities of individuals who are serving as agents of foreign principals in light of their status as foreign agents.

11.     Public officials, including HENRY CUELLAR and all Members of Congress, have a lawful and official duty not to be or act as an agent of a foreign principal required to register under FARA.  At all times relevant to this Indictment, the House Ethics Manual, which was publicly available, stated, among other things, "[r]egardless of compensation, a public official may not act as an agent or attorney for . . . a foreign principal required to register under the Foreign Agents Registration Act of 1938, as amended, that is, generally, those individuals engaged in lobbying, political, or propaganda activities," citing Title 18, United States Code, Section 219.

## THE AZERBAIJAN SCHEME

### *Background on Azerbaijan and Foreign Oil Company-1*

12.     The Republic of Azerbaijan is a former Soviet republic located in the South Caucasus.  Azerbaijan's economy relies heavily on the export of oil and natural gas.  At all times relevant to this Indictment, Foreign Oil Company-1 was the national oil and gas company of Azerbaijan and was wholly owned and controlled by the Government of Azerbaijan.  Foreign Oil

Company-1's President and Vice Presidents were appointed by the President of Azerbaijan and were removable by him. Foreign Oil Company-1 was headquartered in Baku, the capital of Azerbaijan, and maintained offices in various countries around the world. From 2012 to 2015, Foreign Oil Company-1 had an office in Washington, D.C., which acted as its representative for governmental and business affairs in the United States.

13.     One of the most important issues to the Government of Azerbaijan was its decades-long conflict with Armenia over control of the Nagorno-Karabakh region, an ethnic Armenian enclave in western Azerbaijan known to Armenians as Artsakh. For much of the period since Azerbaijan achieved independence in 1991, the Nagorno-Karabakh region was controlled by a separatist government aligned with Armenia. Building support for its position regarding the Nagorno-Karabakh conflict was a major focus of Azerbaijan's diplomatic and lobbying efforts in the United States.

### *Relevant Individuals and Entities*

14.     Individual-1 was a businessperson of Turkish origin residing in Houston, Texas. Individual-1 headed two non-profit organizations in Houston dedicated to promoting the interests of Azerbaijani and other Turkic communities in the United States. Individual-1's organizations received significant funding from Foreign Oil Company-1.

15.     Azerbaijani Diplomat-1, a resident of Washington, D.C., was the Azerbaijani Ambassador to the United States. Previously, from November 2005 to October 2011, Azerbaijani Diplomat-1 was Consul General of the Azerbaijani Consulate in Los Angeles, California.

16.     Azerbaijani Company-1 was an Azerbaijani company headquartered in Baku that purported to provide business services. Azerbaijani Company-1 was an agent of Foreign Oil Company-1, serving as a front for payments from Foreign Oil Company-1 to third parties.

17.     U.S. Affiliate-1 was an affiliate of Azerbaijani Company-1 based in Houston, Texas.  U.S. Affiliate-1 received virtually all its funding from Azerbaijani Company-1 and, like Azerbaijani Company-1, was an agent of Foreign Oil Company-1.

18.     Azerbaijani Company-2 was an Azerbaijani engineering company headquartered in Baku.  Azerbaijani Company-2 was also an agent of Foreign Oil Company-1, serving as a front for payments from Foreign Oil Company-1 to third parties.

19.     U.S. Affiliate-2 was a subsidiary of Azerbaijani Company-2 based in Katy, Texas. Like Azerbaijani Company-2, U.S. Affiliate-2 was an agent of Foreign Oil Company-1.

20.     Individual-2 was a businessperson of Azerbaijani origin residing in Potomac, Maryland.  Individual-2 owned and operated U.S. Company-1, an import/export management company based in Maryland and was the manager and registered agent of U.S. Affiliate-2. Previously, from March 2006 to April 2010, Individual-2 served as Vice Consul at the Azerbaijani Consulate in Los Angeles, reporting to Azerbaijani Diplomat-1.

### *HENRY CUELLAR Develops Ties to Azerbaijan and Foreign Oil Company-1*

21.     In January 2013, one of Individual-1's organizations sponsored HENRY CUELLAR and IMELDA CUELLAR to travel to Istanbul, Turkey and Baku, Azerbaijan at a cost of $26,125.  HENRY CUELLAR's itinerary included briefings from high-level Azerbaijani government officials and a dinner with Foreign Oil Company-1 executives.  The trip was approved and disclosed pursuant to the House Committee on Ethics Travel Regulations.

22.     Shortly after the CUELLARS returned to the United States, Azerbaijani officials discussed recruiting HENRY CUELLAR to promote Azerbaijan's interests in the United States Congress.  On January 23, 2013, an Azerbaijani diplomat emailed the director of Foreign Oil Company-1's Washington, D.C. office, listing the newly announced membership of the

Appropriations Committee's Subcommittee on State, Foreign Operations, and Related Programs, which included HENRY CUELLAR.  The diplomat wrote, "[t]he good news is that Cuellar was just in Baku."  The employee continued, "[w]e need to work with these offices to make sure we build an anti-[Representative-1] coalition."  Representative-1 was a member of the Congressional Armenian Caucus.  The diplomat further wrote, "[i]n your Congressional outreach and engagement with [Individual-1] please keep in mind these folks as a top priority."

***IMELDA CUELLAR Enters First Sham Contract with Foreign Oil Company-1-Related Entity and Receives $60,000 Bribe Payment***

23.     Beginning in at least February 2014, HENRY CUELLAR and IMELDA CUELLAR negotiated a corrupt agreement with Foreign Oil Company-1, using Individual-1 as an intermediary, culminating in the payment of a $60,000 bribe to HENRY CUELLAR via IMELDA CUELLAR's shell company.

24.     On February 25, 2014, after exchanging three text messages with Azerbaijani Diplomat-1, HENRY CUELLAR emailed IMELDA CUELLAR a draft "Consulting Agreement" containing handwritten edits.  The draft contract provided that Foreign Oil Company-1 would pay $25,000 per month to Shell Company-1 purportedly in exchange for unspecified "strategic consulting and advising services."

25.     In the spring and summer of 2014, HENRY CUELLAR and IMELDA CUELLAR engaged in additional negotiations with representatives of Foreign Oil Company-1.  On August 18, 2014, IMELDA CUELLAR signed a revised version of the sham contract.  The signed version substituted Azerbaijani Company-1 for Foreign Oil Company-1 as the counterparty.  It provided that Azerbaijani Company-1 would pay Shell Company-1 a monthly "Consulting Fee" of $20,000 for 12 months, also purportedly in exchange for unspecified "strategic consulting and advising services."  In reality, the contract was a sham used to disguise and legitimate the corrupt agreement

between HENRY CUELLAR and the Government of Azerbaijan. The payments contemplated in the contract were in exchange for HENRY CUELLAR's agreement to perform official acts and acts in violation of his official duties and to act as an agent of the Government of Azerbaijan.

26.     Azerbaijani Company-1 and its Houston-based affiliate, U.S. Affiliate-1, subsequently entered a separate agreement transferring the contract with Shell Company-1 to U.S. Affiliate-1.

27.     On November 26, 2014, Foreign Oil Company-1 caused Azerbaijani Company-1 to wire $60,000 from its account in Azerbaijan to U.S. Affiliate-1's account No. -8952 at U.S. Financial Institution-1, a U.S. bank. Financial Institution-1 account No. -8952 was opened in Houston, Texas. On November 29, 2014, IMELDA CUELLAR sent a falsified invoice to the director of Foreign Oil Company-1's Washington, D.C. office and Individual-1 listing services purportedly performed for U.S. Affiliate-1 under the sham agreement and stating, "All work is complete!" In fact, IMELDA CUELLAR had performed little or no legitimate work under the contract. On December 1, 2014, U.S. Affiliate-1 paid a $60,000 bribe to Shell Company-1's U.S. Financial Institution-1 account No. -5101, opened in Laredo, Texas.

28.     On March 1, 2015, U.S. Affiliate-1 terminated the sham contract.

### IMELDA CUELLAR Enters Second Sham Contract with Foreign Oil Company-1-Related Entity and Receives Second $60,000 Bribe Payment

29.     After U.S. Affiliate-1 terminated the sham contract with Shell Company-1, HENRY CUELLAR and IMELDA CUELLAR negotiated a new sham contract to continue receiving bribe payments from Foreign Oil Company-1. This second sham contract listed Azerbaijani Company-1 as the counterparty and provided that Azerbaijani Company-1 would pay Shell Company-1 a "Consulting Fee" of $20,000 per month, purportedly for unspecified "strategic consulting and advising services." The contract was signed in May 2015, but was backdated to

November 1, 2014.  Like the prior contract, this agreement was a sham used to disguise and legitimate HENRY CUELLAR's corrupt agreement to take official acts and acts in violation of his official duties for the benefit of Azerbaijan and to act as an agent of the Government of Azerbaijan in exchange for bribes.

30.     On June 14, 2015, IMELDA CUELLAR emailed a falsified invoice to a Foreign Oil Company-1 employee, seeking payment for "Contract consulting and advising services."  As with the first bribe payment, IMELDA CUELLAR had performed little or no legitimate work in exchange for the requested payment.  Nonetheless, on June 25, 2015, Foreign Oil Company-1 caused Azerbaijani Company-1 to pay a $60,000 bribe to Shell Company-1's U.S. Financial Institution-1 account No -5101 via international wire transfer.

31.     During the summer of 2015, the media reported on a congressional investigation into Individual-1's efforts to influence the United States Congress on behalf of Foreign Oil Company-1.  During this period of heightened scrutiny, the payments from Foreign Oil Company-1 to Shell Company-1 paused.  Nonetheless, on at least two occasions, in February 2016 and May 2017, representatives of Foreign Oil Company-1 emailed IMELDA CUELLAR proposals to continue the corrupt payments under the guise of new sham consulting contracts between her shell company and entities affiliated with Foreign Oil Company-1 entities.  IMELDA CUELLAR forwarded these proposals to HENRY CUELLAR.

### *IMELDA CUELLAR Enters Third Sham Contract with Foreign Oil Company-1-Related Entity and Receives Bribe Payments Totaling $240,000*

32.     Beginning in at least mid-2017, HENRY CUELLAR and IMELDA CUELLAR negotiated a third sham contract to resume the bribe payments from Foreign Oil Company-1, culminating in the payment of $240,000 in bribes to HENRY CUELLAR via another of IMELDA CUELLAR's shell companies.

33.     On August 22, 2017, Foreign Oil Company-1 formed U.S. Affiliate-2 under the laws of the State of Texas as a subsidiary of Azerbaijani Company-2.  Individual-2, the former Azerbaijani diplomat, was named as its manager and registered agent.

34.     On September 20, 2017, a Foreign Oil Company-1 employee emailed IMELDA CUELLAR regarding IMELDA CUELLAR's "potential engagement with [U.S. Affiliate-2]" as a "Business Development Officer."   The Foreign Oil Company-1 employee asked IMELDA CUELLAR to send a "consulting agreement" to engage her services and explained that the "initial scope of work would be to find suitable partners in the Houston area that are willing and able to supply oil and gas equipment to [Foreign Oil Company-1]."  On September 25, 2017, IMELDA CUELLAR forwarded the Foreign Oil Company-1 employee's email to HENRY CUELLAR.

35.     On September 26, 2017, at the direction of Foreign Oil Company-1, Azerbaijani Company-2 wired $250,000 to U.S. Affiliate-2.

36.     HENRY CUELLAR then arranged for IMELDA CUELLAR to meet with Foreign Oil Company-1 personnel in San Antonio to discuss the proposal.  On October 4, 2017, HENRY CUELLAR texted IMELDA CUELLAR: "U need to be in SA [San Antonio] to meet for lunch on Friday with folks.  All set up."  The following day, IMELDA CUELLAR replied: "You pick a steak house in SA for meeting."  HENRY CUELLAR responded: "Ok."

37.     On October 6, 2017, Azerbaijani Diplomat-1 texted HENRY CUELLAR: "Good morning Boss!  Our friends are asking about tine [*sic*]/location of lunch in SA today.  Thanks."  HENRY CUELLAR responded with the name and address of a steakhouse in San Antonio.  Later that day, IMELDA CUELLAR met with Foreign Oil Company-1 employees at the steakhouse in San Antonio.

38.     HENRY CUELLAR and IMELDA CUELLAR formed a new shell company, Shell Company-2, to receive the bribe payments.  On November 6, 2017, IMELDA CUELLAR emailed HENRY CUELLAR draft articles of incorporation for Shell Company-2, with the message, "Please review.  Thanks."  On November 13, 2017, a Certificate of Formation of Shell Company-2 was filed with the State of Texas.  The Certificate of Formation listed IMELDA CUELLAR as a 60% owner, Relative-1 as a 20% owner, and another relative of the CUELLARS as a 20% owner.

39.     HENRY CUELLAR and IMELDA CUELLAR drafted a new sham contract between U.S. Affiliate-2 and Shell Company-2.  On November 13, 2017, HENRY CUELLAR texted IMELDA CUELLAR: "Did u get email on contract from me?  Draft?"  Later that day, HENRY CUELLAR again texted IMELDA CUELLAR: "Type and get me another draft.  I have more additions."  From December 19 to 21, 2017, HENRY CUELLAR repeatedly texted IMELDA CUELLAR to "send off" the signed contract.

40.     On December 24, 2017, IMELDA CUELLAR emailed the signed contract between U.S. Affiliate-2 and Shell Company-2 to a Foreign Oil Company-1 employee.  The contract provided that Shell Company-2 would "consult" with U.S. Affiliate-2 "concerning the business development pertaining to [U.S. Affiliate-2's] activities" in exchange for a "business fee" of $20,000 per month for 12 months beginning January 1, 2018.  On December 27, 2017, the Foreign Oil Company-1 employee emailed the contract, countersigned by Individual-2, back to IMELDA CUELLAR.  Like the prior contracts, this contract was a sham used to disguise and legitimate HENRY CUELLAR's corrupt agreement to take official acts and acts in violation of his official duties to benefit the Government of Azerbaijan and to act as an agent of the Government of Azerbaijan in exchange for bribe payments.

41.     On January 24, 2018, IMELDA CUELLAR opened a checking account for Shell Company-2 at U.S. Financial Institution-2, a U.S. bank.  Beginning on January 30, 2018, and continuing approximately every other month, Individual-2 deposited a series of seven checks into Shell Company-2's account No. -6162 at U.S. Financial Institution-2, totaling $240,000.  Six of the seven checks were drawn on U.S. Affiliate-2's bank account.  The seventh check was drawn on the account of Individual-2's company, U.S. Company-1.  IMELDA CUELLAR performed little or no legitimate work in exchange for the payments.

42.     In total, HENRY CUELLAR and IMELDA CUELLAR, through Shell Company-1 and Shell Company-2, received at least $360,000 in bribe payments pursuant to the three sham contracts with Foreign Oil Company-1-related entities:

[CONTINUED ON NEXT PAGE]

| TABLE 1: Bribe Payments from Foreign Oil Company-1-Related Entities to IMELDA CUELLAR's Shell Companies | | | | |
|---|---|---|---|---|
| Date | From | To | Amount | Check or Wire Memo Line |
| 12/1/2014 | U.S. Affiliate-1 | Shell Company-1 | $60,000 | [none] |
| 6/25/2015 | Azerbaijani Company-1 | Shell Company-1 | $60,000 | "Consulting Agreement Invoice" |
| 1/29/2018 | U.S. Affiliate-2 | Shell Company-2 | $20,000 | "Consulting Services" |
| 3/8/2018 | U.S. Affiliate-2 | Shell Company-2 | $40,000 | "Consulting Services" |
| 5/15/2018 | U.S. Affiliate-2 | Shell Company-2 | $40,000 | "Consulting Services" |
| 7/18/2018 | U.S. Affiliate-2 | Shell Company-2 | $40,000 | "Consulting Services" |
| 9/27/2018 | U.S. Affiliate-2 | Shell Company-2 | $40,000 | "August – September 2018" |
| 1/9/2019 | U.S. Company-1 | Shell Company-2 | $30,000 | "2018 Outstanding Balance" |
| 3/19/2019 | U.S. Affiliate-2 | Shell Company-2 | $30,000 | "1/2 October, November, December" |
| TOTAL | | | $360,000 | |

### HENRY CUELLAR Arranges for Relative-1 to Take Over U.S. Affiliate-2 and Receive Additional Bribe Payments

43.     In 2021, HENRY CUELLAR took steps to transfer the corrupt agreement from IMELDA CUELLAR to Relative-1.  On February 22, 2021, HENRY CUELLAR emailed Relative-1 a draft consulting contract.  On February 24, 2021, Relative-1 emailed HENRY CUELLAR a draft message stating that Relative-1 was enclosing a "draft of the contract that you requested" and that Relative-1 was "willing to keep the same terms as per this draft."  HENRY CUELLAR responded, in relevant part: "Good to go."  On March 1, 2021, Relative-1 emailed the same message to a Foreign Oil Company-1 employee, attaching the draft contract that HENRY CUELLAR had emailed to Relative-1 a week earlier.

44.     On April 30, 2021, Relative-1 formed a new shell company, Shell Company-3, to receive additional bribe payments.  From June to September 2021, in a text message chain and at

least one conference call, Relative-1, Individual-2, and a Foreign Oil Company-1 employee discussed a plan for Foreign Oil Company-1 to make additional corrupt payments to Relative-1 and to transfer control of U.S. Affiliate-2 to Relative-1.

### HENRY CUELLAR Agrees to Perform Official Acts and to Engage in Political Activities on Behalf of the Government of Azerbaijan

45.     IMELDA CUELLAR performed little or no legitimate work in exchange for the payments she received from Foreign Oil Company-1.  Instead, in exchange for the bribe payments, HENRY CUELLAR agreed to perform official acts and acts in violation of his official duties benefitting Azerbaijan and to be and act as an agent of the Government of Azerbaijan with respect to: legislation relating to U.S. security and economic development programs, legislation and policy relating to the Nagorno-Karabakh conflict, immigration issues relating to an Azerbaijani citizen, and the promotion of Azerbaijan's reputation as an ally and strategic partner of the United States, among other matters.  The official acts, violations of official duty, and agency activities as defined under FARA in which HENRY CUELLAR agreed to engage included:

a.     On May 5, 2014, HENRY CUELLAR emailed Azerbaijani Diplomat-1, Individual-1, and an associate of Individual-1 reporting that he had placed language within that year's National Defense Authorization Act, stating, "Good news!"  HENRY CUELLAR's email attached a section of a bill directing the Secretary of Defense, in coordination with the Secretary of State, to "develop a strategic framework for United States security force assistance and cooperation in the European and Eurasian regions"—which included Azerbaijan—and submit a report to Congress.  Azerbaijani Diplomat-1 responded: "Thank you Congressman!  This is good indeed."  Azerbaijani Diplomat-1 continued: "need to meet with DOD [Department of Defense] to get some focus on the Silk Road region," which included Azerbaijan.  HENRY CUELLAR replied, "I will set up the meeting."

b.       On June 23, 2014, Azerbaijani Diplomat-1 emailed HENRY CUELLAR, copying Individual-1, that he "heard that [Representative-1]"—a member of the Congressional Armenian Caucus—would "offer an amendment to the bill tmrw" and asked HENRY CUELLAR to "try to keep it out."  HENRY CUELLAR responded that he would "try [his] best" and that he would "ask [his] staff about it."  Azerbaijani Diplomat-1 responded: "Thank you!"  Individual-1 replied that an employee of the Azerbaijani embassy would reach out to HENRY CUELLAR's staffer to provide talking points for HENRY CUELLAR regarding the potential amendment.

c.       On June 23, 2014, HENRY CUELLAR emailed Azerbaijani Diplomat-1 and Individual-1 a document summarizing funding measures in the State, Foreign Operations, and Related Programs Appropriations Bill related to Europe and Eurasia, with the message: "We need to follow up for Azerbaijan."  Individual-1 asked: "Anything specific I should do?"  HENRY CUELLAR advised Individual-1: "When we pass the final approps [appropriations] bill work the DOD defense etc to make sure Azerbaijan gets it's [*sic*] fair share."  HENRY CUELLAR later followed up: "I will send u the updated one with Silk Road language."

d.       On January 13, 2015, one of HENRY CUELLAR's staffers reached out to Individual-1 to solicit input on Azerbaijan-related language in an Appropriations Committee Report.  Individual-1, in turn, solicited input from employees at the Embassy of Azerbaijan.  On January 14, 2015, an Azerbaijani diplomat emailed Individual-1, copying Azerbaijani Diplomat-1, requesting that HENRY CUELLAR advocate for language expressing the Committee's support for "initiatives to accelerate regional integration of the Northern Distribution Network countries"—which included Azerbaijan—"that boost transit, trade, and energy linkages in the region and increase economic growth and stability by expanding trade through neighboring

countries." Individual-1 forwarded the diplomat's email to HENRY CUELLAR, who responded, "Sounds good!" and instructed Individual-1 to send the proposed language to his staff.

e.      On May 29, 2015, HENRY CUELLAR emailed Azerbaijani Diplomat-1 and Individual-1 the text of a speech that he intended to give on the floor of the House of Representatives in honor of Azerbaijani Republic Day. The proposed speech praised Azerbaijan's history and emphasized Azerbaijan's strategic importance to the United States, including: "Since its independence, the Republic of Azerbaijan has been an ally and is among the first nations who offered unconditional support to the United States in the global War on Terrorism, providing its airspace and the use of its airports for Operation Enduring Freedom in Afghanistan. Today, Azerbaijan continues to be a strategic partner with the US."

f.      On April 11, 2016, HENRY CUELLAR wrote a letter to U.S. Official-1, a high-ranking Executive Branch Official, accusing Armenia of being a "proxy" for Russia "to intimidate U.S. partners, including Azerbaijan," and expressing support for "the withdrawal of the military forces from the occupied territories of Azerbaijan," meaning the Nagorno-Karabakh region. On April 12, 2016, one of HENRY CUELLAR's staffers emailed the letter to Azerbaijani Diplomat-1 and stated that the letter "was sent to our White House legislative affairs contact."

g.      On March 31, 2017, HENRY CUELLAR texted Azerbaijani Diplomat-1: "Submitted language today." Azerbaijani Diplomat-1 responded: "You are the best El Jefe!" HENRY CUELLAR replied: "Yes sir."

h.      On September 1, 2017, Azerbaijani Diplomat-1 texted HENRY CUELLAR a screenshot of an amendment to the Department of Interior, Environment, and Related Agencies Appropriations Act for Fiscal Year 2018 proposed by Representative-2, a member of the Congressional Armenian Caucus. Representative-2's amendment would appropriate $1.5 million

to fund efforts to clear land mines in the Nagorno-Karabakh region.  Those efforts were supported by Armenia and opposed by Azerbaijan.  HENRY CUELLAR replied: "I see it.  We work on it." Azerbaijani Diplomat-1 responded, "Thank you Boss!"   On September 6, 2017, Azerbaijani Diplomat-1 and HENRY CUELLAR exchanged the following text messages:

| Azerbaijani Diplomat-1: | Boss, do you know [Representative-2]? |
| CUELLAR: | Yes sir. |
| Azerbaijani Diplomat-1: | Any chance of talking him into withdrawing his amendment or no way?<br>Coming up on the floor today |
| CUELLAR: | I will ask him |

      i.     From October 2017 through March 2018, a member of HENRY CUELLAR's staff sent multiple emails to officials at the Department of State advising and pressuring them to renew the U.S. passport of Azerbaijani Diplomat-1's daughter.

      j.     On March 8, 2019, Azerbaijani Diplomat-1 texted HENRY CUELLAR a link to a tweet by Representative-3, a member of the Congressional Armenian Caucus. Representative-3's tweet stated: "The US Gov maintains an outdated, self-imposed ban on engagement with #Artsakh b/c of pressure from Azerbaijan.   The Artsakh Travel & Communications Resolution I introduced urges US to finally recognize Artsakh & encourage more direct US-Artsakh cooperation."  HENRY CUELLAR replied: "We got to make sure it doesn't pass.  Are u working the Committee?"   Azerbaijani Diplomat-1 and HENRY CUELLAR exchanged additional text messages about Azerbaijani Diplomat-1's efforts to block Representative-3's amendment.

      k.     In the summer of 2020, tensions between Azerbaijan and Armenia in the Nagorno-Karabakh region began to escalate, culminating in open hostilities in the fall of 2020.  On June 26, 2020, HENRY CUELLAR texted Azerbaijani Diplomat-1 that he would be "looking at

an amendment to add" relating to countries, such as Armenia, that host Russian bases in their territories.  On July 5, 2020, HENRY CUELLAR again texted Azerbaijani Diplomat-1, promising to attempt to "add Rider on bases."  On July 14, 2020, Azerbaijani Diplomat-1 and HENRY CUELLAR exchanged additional text messages discussing recent cross-border hostilities between Azerbaijan and Armenia.  HENRY CUELLAR texted: "Let's talk soon."  Azerbaijani Diplomat-1 replied: "Anytime Boss!  And your amendment is more timely than ever.  It is all about Russian presence there," meaning Armenia.  HENRY CUELLAR responded: "Oh yes."  Azerbaijani Diplomat-1 replied: "🙏 🙏"

l.      On July 18, 2020, Azerbaijani Diplomat-1 texted HENRY CUELLAR a link to a news article describing recent violence in the Nagorno-Karabakh region.  HENRY CUELLAR and Azerbaijani Diplomat-1 exchanged the following text messages:

| | |
|---|---|
| CUELLAR: | Conflict seems to be escalating |
| Azerbaijani Diplomat-1: | Yes, unfortunately.  I feel like Russians are trying hard to disrupt pipelines and transport routes.  Can't believe so many members of Congress support this Armenian-Russian attack :-( |
| CUELLAR: | I have another amendment I may add this week |
| Azerbaijani Diplomat-1: | Thank you Boss!  Can we encourage someone, not you!, to make a balanced statement or tweet on the situation |
| CUELLAR: | [Representative-4]?   I am working on the approps [appropriations] to help |
| Azerbaijani Diplomat-1: | We are trying to reach him!<br>I know about approps.  Thank you! |
| CUELLAR: | Have your staff call [CUELLAR staffer] about another am [amendment] I will try to add this week because [Representative-5] is push another amendment |

Azerbaijani Diplomat-1:          Will do!

m.      On July 21, 2020, Representative-5, a member of the Congressional Armenian Caucus, proposed an amendment to the State, Foreign Operations, and Related Programs Appropriations Act for Fiscal Year 2021 that would appropriate $1.4 million for de-mining efforts in the Nagorno-Karabakh region.   On July 22, 2020, HENRY CUELLAR texted Azerbaijani Diplomat-1 a tweet from the Armenian Assembly reporting that HENRY CUELLAR had withdrawn an amendment blocking funding to certain autonomous regions, such as the Nagorno-Karabakh region.   HENRY CUELLAR and Azerbaijani Diplomat-1 exchanged the following text messages:

CUELLAR:                 It was going to be ruled out of order so I withdrew but they are taking credit ha ha

Azerbaijani Diplomat-1:   They take credit for everything!
Let's make sure [Representative-5] amendment doesn't pass.

## THE FOREIGN BANK-1 SCHEME

### *Background on Foreign Bank-1 and Correspondent Banking*

46.      Foreign Bank-1 was a retail banking chain headquartered in Mexico City, Mexico. Foreign Bank-1 served low-income sectors in Mexico and Central America, providing money transfer, consumer financing, depository, and other services.   It was owned by Mexican Company-1, a Mexican finance and retail holding company.  Mexican Company-1, in turn, was a member of Mexican Conglomerate-1, a Mexican corporate conglomerate.

47.      U.S. Affiliate-3 was a Spanish-language media and entertainment company based in Los Angeles, California.  U.S. Affiliate-3's parent company, a Mexican media company, was a member of Mexican Conglomerate-1.

48.     U.S. Affiliate-4 was a payday lending company based in the United States and was a subsidiary of Mexican Company-1.

49.     Foreign Bank-1, like many banks, relied on correspondent banking relationships to facilitate cross-border transactions.   Correspondent banking refers to bilateral relationships between banks whereby one bank, the correspondent bank, holds accounts for and provides payment and other services to the other bank, typically located in another country.  Beginning in at least 2012, U.S. regulators increased enforcement of the Bank Secrecy Act and other anti-money laundering laws and regulations.   This increase in regulatory oversight prompted some U.S. financial institutions to limit or withdraw from correspondent banking relationships with financial institutions in countries perceived to pose a high risk of money-laundering activity, including Mexico.  This phenomenon was referred to as "de-risking."  De-risking was of great concern to Foreign Bank-1, as it impeded the bank's ability to access the U.S. financial system.  In particular, Foreign Bank-1 needed correspondent banking relationships with U.S. banks to help it repatriate large reserves of physical U.S. currency that it held in Mexico back to the United States and to convert the physical currency to electronic dollars, which Foreign Bank-1 could more readily spend or transfer.

### *Relevant Individuals*

50.     Executive-1 was the Vice Chairman of Foreign Bank-1 from at least 2014 to at least 2024.   Beginning in January 2019, Executive-1 also became the President of a trade group representing the interests of the Mexican banking system.

51.     Executive-2 was an executive at Mexican Conglomerate-1 with responsibility for legislative affairs.

52.     Mexican Official-1 was a Mexican politician and an associate of HENRY CUELLAR.  From 2012 through 2015, Mexican Official-1 served in the Chamber of Deputies, the lower house of the Mexican Congress, representing a district within the State of Nuevo León.  After Mexican Official-1's term as a Deputy, Mexican Official-1 held various positions with the State of Nuevo León.

53.     Individual-3 was a businessperson and longtime associate of HENRY CUELLAR residing in San Antonio, Texas.  Individual-3 owned and operated Consulting Company-1 and Consulting Company-2, consulting companies based in Corpus Christi, Texas.

54.     Individual-4 was HENRY CUELLAR's campaign manager and former chief of staff residing in Buda, Texas.  Individual-4 owned and operated Consulting Company-3, a political consulting company based in Buda.

### HENRY and IMELDA CUELLAR Negotiate Sham Contract with Foreign Bank-1-Related Entity

55.     Beginning in at least May 2014, in the same period in which they were negotiating the first sham contract with Foreign Oil Company-1, HENRY CUELLAR and IMELDA CUELLAR negotiated a similar corrupt agreement with Foreign Bank-1, using Mexican Official-1 as an intermediary.  These negotiations resulted in the signing of a sham consulting contract and the payment of $236,390 in bribes to HENRY CUELLAR via IMELDA CUELLAR's shell company, funneled through multiple layers of middlemen and related entities.

56.     On May 28, 2014, HENRY CUELLAR emailed Mexican Official-1 with the subject line, "[Foreign Bank-1] Contract with [Shell Company-1] Contract.doc."  Attached to the email was a draft contract listing Shell Company-1 as the "Consultant" with the key terms, such as the counterparty, the contract term, and the compensation, left blank.  On July 30, 2014,

21

Mexican Official-1 forwarded HENRY CUELLAR's email and the attached draft contract to Executive-2.

57.     In early December 2014, HENRY CUELLAR and IMELDA CUELLAR traveled to Mexico, where they met with Executive-1 to discuss the corrupt agreement.  On December 16, 2014, IMELDA CUELLAR emailed Mexican Official-1 a new draft of the sham contract.  This draft added U.S. Affiliate-3, the Los Angeles-based media company affiliated with Foreign Bank-1 through common membership in Mexican Conglomerate-1, as the counterparty.  Other terms, such as the contract term and the compensation, remained blank.

58.     On January 23, 2015, Executive-1 attempted to email IMELDA CUELLAR another draft of the contract between Shell Company-1 and U.S. Affiliate-3, copying Mexican Official-1. This draft provided that Shell Company-1 would provide unspecified "strategic consulting and advising services" for two years beginning on January 1, 2015.  In exchange, U.S. Affiliate-3 would pay Shell Company-1 a "Consulting Fee" of $12,000 per month.  In addition to the monthly consulting fee, the contract also established a schedule of performance fees rewarding Shell Company-1 in amounts between $100,000 and $500,000 if U.S. Affiliate-3 succeeded in "establish[ing] business relationships with correspondant [*sic*] banks in the United States" in the first 12 to 18 months of the contract.

59.     Executive-1 sent the email described in the preceding paragraph to the wrong email address for IMELDA CUELLAR.  On January 25, 2015, Mexican Official-1 forwarded Executive-1's email, with the attachment, to the correct email address for IMELDA CUELLAR. On January 26, 2015, IMELDA CUELLAR forwarded Mexican Official-1's email and the attached draft contract to HENRY CUELLAR.

60.     From March 5 to 8, 2015, HENRY CUELLAR and Mexican Official-1 exchanged messages about finding another middleman to further disguise the bribe payments.   In one message, Mexican Official-1 told HENRY CUELLAR that "we need to find another scheme for [Foreign Bank-1]" because entering the contract directly with Shell Company-1 was "not recommended."   Mexican Official-1 suggested that it would be better to find "another consulting firm or another person" to serve as a middleman.   When Mexican Official-1 suggested using "a Mexican company in Mexico," HENRY CUELLAR responded: "Prefer American."

### HENRY CUELLAR Inserts Individual-3 as a Middleman to Launder the Funds

61.     On October 14, 2015, HENRY CUELLAR and his longtime associate, Individual-3, who owned two Texas-based consulting companies, met for breakfast at a hotel in Mexico City.   At the meeting, HENRY CUELLAR recruited Individual-3 to serve as a U.S.-based middleman to further disguise and legitimate the bribe payments.   Following the meeting, HENRY CUELLAR texted Individual-3's contact information to Executive-1, telling him, "[a]t your convenience, please call [Individual-3] about the contract."   On October 16, 2015, Individual-3 and Mexican Official-1 met for breakfast in Mexico City to discuss the sham contract.

62.     On October 16, 2015, HENRY CUELLAR texted Mexican Official-1: "The contract is moving with a American company.   U and him have to share."   Mexican Official-1 replied: "kool."

63.     In late October 2015, HENRY CUELLAR and IMELDA CUELLAR exchanged emails in which HENRY CUELLAR revised the draft contract.   On October 28, 2015, IMELDA CUELLAR emailed the revised contract to Executive-1.   Later that day, HENRY CUELLAR texted Executive-1: "Imelda sent you this morning her contract for your review."   Consistent with

the earlier draft, this draft provided that U.S. Affiliate-3 would pay Shell Company-1 a "Consulting Fee" of $12,000 per month.

64.     On October 30, 2015, Individual-3 met with Executive-1 in Mexico City.  The following day, Individual-3 emailed himself a series of photographs of a hard copy of the draft contract between U.S. Affiliate-3 and Shell Company-1, which included the "Consulting Fee" of $12,000 per month.

65.     On November 15, 2015, HENRY CUELLAR met Individual-3 for breakfast in Laredo, Texas.  At the meeting, HENRY CUELLAR and Individual-3 discussed the details of the sham contract.  HENRY CUELLAR asked Individual-3 to confirm that the contract fee would be $12,000 per month and directed Individual-3 to pay IMELDA CUELLAR $10,000 per month from those funds.  HENRY CUELLAR also told Individual-3 to "take care of" Mexican Official-1 for facilitating the agreement with Foreign Bank-1.

66.     Individual-3 told HENRY CUELLAR that it was not a good idea to pay IMELDA CUELLAR directly.  HENRY CUELLAR suggested that Individual-3 pay HENRY CUELLAR's campaign manager, Individual-4, and Individual-4 would, in turn, pay IMELDA CUELLAR.  HENRY CUELLAR explained to Individual-3 that for their trouble, Individual-3 and Individual-4 would each get $1,000 per month.

67.     Individual-3 agreed to the payment scheme but asked for more than $1,000 per month.  HENRY CUELLAR told Individual-3 to negotiate with Executive-1 to raise the monthly fee.  Individual-3 subsequently asked Executive-1 to increase the consulting fee to $15,000 per month and Executive-1 agreed.  At no time did HENRY CUELLAR and Individual-3 discuss any work that IMELDA CUELLAR, Individual-3, or Individual-4 would perform in exchange for the payments proposed by HENRY CUELLAR.

68.     On December 17, 2015, while in Mexico City, Individual-3 signed the final contract.  The final contract substituted Individual-3's company, Consulting Company-1, as the "Consultant" in place of Shell Company-1.  It provided that U.S. Affiliate-3 would pay Consulting Company-1 $15,000 per month for two years, effective January 1, 2016, purportedly in exchange for "strategic consulting and advising services."  The schedule of performance fees ranged from $500,000 to "US Dollars. 615,000.00 (seven hundred fifty thousand, U.S. dollars) [*sic*]."  The final contract deleted the reference to "establish[ing] business relationships with correspondant [*sic*] banks in the United States," providing instead that the success fees would be paid "if [U.S. Affiliate-3] is successful in reaching the agreed upon goals," without further elaboration.

69.     From the fall of 2015 to January 10, 2016, HENRY CUELLAR repeatedly texted Mexican Official-1 to inquire about the status of the contract and urge Mexican Official-1 to pressure Executive-1 to get it signed.

70.     On January 11, 2016, representatives of U.S. Affiliate-3 countersigned the contract. This contract, like the sham contracts involving Foreign Oil Company-1, was used to disguise and legitimate unlawful payments from Foreign Bank-1 to HENRY CUELLAR in exchange for HENRY CUELLAR's agreement to perform official acts and acts in violation of his official duties and to act as an agent of Foreign Bank-1.

### HENRY CUELLAR Inserts Individual-4 as Another Middleman to Launder the Funds

71.     In February 2016, consistent with his prior discussions with Individual-3, HENRY CUELLAR approached Individual-4 and asked him to meet with Individual-3.  On February 25, 2016, Individual-3 and Individual-4 met at a restaurant in San Antonio, Texas.  To conceal the true nature of the scheme, Individual-3 told Individual-4 that he was working on a project to test, certify, and sell a fuel lubricant produced by Mexican Company-2, a Mexico-based manufacturer

of lubricant products, in the United States.  Individual-3 offered to pay Individual-4 $11,000 per month conditioned on Individual-4 making $10,000 monthly payments to IMELDA CUELLAR. The Mexican Company-2 project was merely a cover story to disguise and legitimate the payments from Individual-3's company to Individual-4's company.

72.     Beginning in March 2016, IMELDA CUELLAR emailed Individual-4 falsified invoices pursuant to the sham contract.  For example, on March 10, 2016, IMELDA CUELLAR sent Individual-4 two falsified invoices for $10,000 each for the months of January and February 2016, with the description, "Project management fee."  In fact, at that time and during the entire period in which she received payments from Consulting Company-3, IMELDA CUELLAR performed little or no legitimate work in exchange for the payments.

### The Sham Contract is Renewed for an Additional Year

73.     The sham contract between U.S. Affiliate-3 and Consulting Company-1 expired at the end of 2017.  On February 1, 2018, although Individual-3 had rendered no legitimate services under the original contract, Individual-3 and representatives of U.S. Affiliate-3 signed a contract extension renewing the contract for an additional year, on the same terms.

### Payments from Foreign Bank-1 to IMELDA CUELLAR

74.     Beginning in February 2016, the bribe payments began to flow from Foreign Bank-1 to U.S. Affiliate-3, then to Individual-3's company, then to Individual-4's company, and finally to IMELDA CUELLAR's company, Shell Company-1.  These payments were made pursuant to HENRY CUELLAR's corrupt agreement to act as an agent of Foreign Bank-1 and to take official acts and acts in violation of his official duties beneficial to Foreign Bank-1 in exchange for bribes.

75.     On February 19, 2016, U.S. Affiliate-3 received an initial wire transfer of $30,000 from a money-changing business located in Spain.  The wire noted that it was sent on behalf of Foreign Bank-1.   In approximately each subsequent month through December 2018, U.S. Affiliate-3 received a wire transfer of $15,000 from the Spanish money-changing business, made on behalf of Foreign Bank-1, for a total of $540,000.

76.     From February 22, 2016, through January 9, 2019, U.S. Affiliate-3 used the funds it received from Foreign Bank-1 to pay Individual-3's company, Consulting Company-1, $15,000 on an approximately monthly basis, totaling $540,000, as follows:

[CONTINUED ON NEXT PAGE]

| TABLE 2:  Payments from U.S. Affiliate-3 to Consulting Company-1 | | | |
|---|---|---|---|
| **Date** | **Method** | **Amount** | **Check or Wire Memo Line** |
| 2/22/2016 | Wire | $30,000 | "[Consulting Company-1] INVOICES 1164, 1165" |
| 3/15/2016 | Wire | $15,000 | "[Consulting Company-1] MARCH INVOICE-1166" |
| 4/7/2016 | Check | $15,000 | "INV#1168" |
| 4/26/2016 | Wire | $15,000 | "[Consulting Company-1] INVOICES 1168" |
| 6/17/2016 | Wire | $15,000 | "[Consulting Company-1] INVOICES 1170" |
| 7/15/2016 | Wire | $15,000 | "[Consulting Company-1] INVOICE 1172" |
| 9/6/2016 | Wire | $15,000 | "[Consulting Company-1] INVOICE 1173" |
| 9/22/2016 | Wire | $15,000 | "[Consulting Company-1] SEPT INVOICE 1174" |
| 11/1/2016 | Wire | $30,000 | "[Consulting Company-1] INVOICE 1175, 1176" |
| 12/8/2016 | Wire | $15,000 | "[Consulting Company-1] DEC INVOICE 1181" |
| 2/1/2017 | Wire | $15,000 | "[Consulting Company-1] JAN INVOICE 1184" |
| 2/22/2017 | Wire | $15,000 | "[Consulting Company-1] FEB INVOICE 1185" |
| 3/21/2017 | Wire | $15,000 | "[Consulting Company-1] INVOICE 1186" |
| 4/13/2017 | Wire | $15,000 | "[Consulting Company-1] APRIL INVOICE 1190" |
| 5/24/2017 | Wire | $15,000 | "[Consulting Company-1] INVOICE 1191" |
| 6/7/2017 | Wire | $15,000 | "[Consulting Company-1] JUNE INVOICE 1192" |
| 7/27/2017 | Wire | $15,000 | "[Consulting Company-1] INVOICE 1195 & "JULY CONSULTING FEES" |
| 9/12/2017 | Wire | $30,000 | "AUG, SEPT INVOICES INV 1196-1197" |
| 10/19/2017 | Wire | $15,000 | "[Consulting Company-1] INVOICE 1204" |
| 11/7/2017 | Wire | $15,000 | "[Consulting Company-1] INVOICE 1205" |
| 12/15/2017 | Wire | $15,000 | "[Consulting Company-1] DEC INVOICE 1206" |
| 2/21/2018 | Wire | $30,000 | "[Consulting Company-1] INVOICES 1207,1208" |
| 3/16/2018 | Wire | $15,000 | "[Consulting Company-1] INVOICE 1209" |
| 3/22/2018 | Wire | $15,000 | "[Consulting Company-1] INVOICE 1209" |
| 5/22/2018 | Wire | $15,000 | "INVOICE 1211" |
| 6/4/2018 | Wire | $15,000 | "INVOICE 1212" |
| 7/13/2018 | Wire | $15,000 | "JULY INVOICE 1213" |
| 8/10/2018 | Wire | $15,000 | "[Consulting Company-1] INVOICE 1214" |
| 9/10/2018 | Wire | $15,000 | "[Consulting Company-1] INVOICE 1215" |
| 10/16/2018 | Wire | $15,000 | "[Consulting Company-1] INVOICE 1216" |
| 11/23/2018 | Wire | $15,000 | "[Consulting Company-1] INVOICE 1217" |
| 1/9/2019 | Wire | $15,000 | "[Consulting Company-1] INVOICE 1218" |
| **TOTAL** | | **$540,000** | |

77.     Consulting Company-1 did not provide any services to U.S. Affiliate-3 or Foreign Bank-1 in exchange for these payments.  Rather, from March 24, 2016, through December 27, 2017, pursuant to his agreement with HENRY CUELLAR, Individual-3 used the funds that his company received from U.S. Affiliate-3 to pay Individual-4's company $11,000 on an approximately monthly basis, totaling $242,000.  Although Individual-3 stopped making regular payments to Individual-4 after December 2017, Individual-3 continued to receive monthly wire transfers from U.S. Affiliate-3 until January 2019.  Individual-3 understood that, pursuant to his agreement with HENRY CUELLAR, Individual-3 remained obligated to pay IMELDA CUELLAR $10,000 of each monthly payment that he received from U.S. Affiliate-3.  In March 2018 and June 2019, at HENRY CUELLAR's direction, Individual-3's companies made three additional payments to Individual-4's company, totaling $19,000.   The payments from Individual-3's companies to Individual-4's company are summarized in the following table:

[CONTINUED ON NEXT PAGE]

| TABLE 3:  Payments from Consulting Company-1 and Consulting Company-2 to Consulting Company-3 | | | |
|---|---|---|---|
| **Date** | **Method** | **Amount** | **Check or Wire Memo Line** |
| 3/24/2016 | Check | $22,000 | "[Mexican Company-2] Consulting" |
| 4/8/2016 | Check | $11,000 | "Monthly Consulting Fee" |
| 6/3/2016 | Check | $11,000 | "March Services" |
| 6/3/2016 | Check | $11,000 | "April Services" |
| 7/14/2016 | Check | $11,000 | "June – "[Mexican Company-2]" |
| 8/8/2016 | Check | $11,000 | "July Payment "[Mexican Company-2] Project" |
| 9/14/2016 | Check | $11,000 | "August" |
| 10/20/2016 | Check | $11,000 | "Consulting "[Mexican Company-2] Sept" |
| 12/8/2016 | Check | $11,000 | "Nov" |
| 12/20/2016 | Check | $11,000 | "Dec Invoice Consulting" |
| 2/13/2017 | Check | $11,000 | "Jan Payment per Contract" |
| 3/20/2017 | Check | $11,000 | "Feb Payment" |
| 4/17/2017 | Check | $11,000 | "March" |
| 5/29/2017 | Check | $11,000 | "Apr. Payment" |
| 6/28/2017 | Check | $11,000 | "May" |
| 8/7/2017 | Check | $11,000 | "June" |
| 9/7/2017 | Check | $11,000 | "July 2017" |
| 9/22/2017 | Check | $11,000 | "Aug" |
| 10/16/2017 | Check | $11,000 | "Sept" |
| 12/15/2017 | Check | $11,000 | "Nov" |
| 12/27/2017 | Check | $11,000 | "Dec" |
| 3/20/2018 | Check | $7,000 | "Jan (Petro project" |
| 3/26/2018 | Check | $5,000 | "Jan Final – Lubricant Project" |
| 6/11/2019 | Check | $7,000 | "Consult" |
| **TOTAL** | | **$261,000** | |

78.     All the checks listed above were drawn on Consulting Company-1's account except for the December 15, 2017 check, which was drawn on an account owned by Individual-3's other company, Consulting Company-2.

79.     Individual-4 did not perform any legitimate services in exchange for the payments Consulting Company-3 received from Individual-3's companies.  From March 29, 2016, through

January 25, 2018, Individual-4 used those funds to pay approximately $10,000 per month to Shell Company-1, totaling $214,890.  On November 15, 2018, December 14, 2018, June 13, 2019, and December 2, 2019, Individual-4's company, Consulting Company-3, made four additional payments to Shell Company-1 totaling $21,500.

80.     The payments from Consulting Company-3 to Shell Company-1 are summarized in the following table:

| TABLE 4:  Payments from Consulting Company-3 to Shell Company-1 | | | |
|---|---|---|---|
| **Date** | **Method** | **Amount** | **Check or Wire Memo Line** |
| 3/29/2016 | Check | $10,000 | January Payment |
| 3/29/2016 | Check | $10,000 | Fedruary [*sic*] Payment |
| 4/22/2016 | Wire | $9,990 | --NONE-- |
| 6/8/2016 | Wire | $19,990 | April/May Invoice |
| 7/20/2016 | Wire | $10,000 | June Invoice |
| 9/1/2016 | Wire | $10,000 | --NONE-- |
| 9/26/2016 | Wire | $10,000 | --NONE-- |
| 11/1/2016 | Wire | $10,000 | Sept. Payment |
| 12/27/2016 | Wire | $19,970 | --NONE-- |
| 3/7/2017 | Wire | $9,990 | --NONE-- |
| 4/4/2017 | Wire | $10,000 | --NONE-- |
| 5/20/2017 | Check | $10,000 | --NONE-- |
| 6/21/2017 | Wire | $9,950 | April Payment |
| 7/26/2017 | Check | $10,000 | June Payment |
| 9/1/2017 | Wire | $10,000 | June Payment |
| 11/1/2017 | Check | $15,000 | August and September |
| 12/29/2017 | Check | $10,000 | November |
| 1/25/2018 | Check | $20,000 | November & December Fee |
| 11/15/2018 | Check | $7,500 | 2018 Half Balance |
| 12/14/2018 | Check | $7,500 | Final 2018 |
| 6/13/2019 | Check | $3,000 | Retainer |
| 12/2/2019 | Cash | $3,500 | n/a |
| **TOTAL** | | **$236,390** | |

### *Individual-3 Pays Relative-1 Pursuant to the Corrupt Scheme*

81.     In late 2021, HENRY CUELLAR asked Individual-3 to hire Relative-1.  Pursuant to HENRY CUELLAR's request, Individual-3 and Relative-1 discussed a purported consulting agreement between Relative-1's shell company, Shell Company-3, and Consulting Company-1. Individual-3 and Relative-1 verbally agreed that Individual-3 would pay Relative-1 $2,000 per month, purportedly for consulting services.  The purported consulting services were a cover for the true purpose of the agreement, which was to pay the remainder of the money that Individual-3 owed to HENRY CUELLAR under the Foreign Bank-1 contract.

82.     On November 21, 2021, Individual-3 met Relative-1 at a restaurant in Laredo, Texas, to discuss the purported consulting agreement.  At the meeting, Individual-3 gave Relative-1 a check drawn on Consulting Company-1's bank account in the amount of $2,000, payable to Shell Company-3, with the memo line, "Consulting."  The check was deposited into Shell Company-3's bank account.  Individual-3 and Relative-1 had not entered any written contract, nor had Relative-1 rendered any services to Consulting Company-1.

### *HENRY CUELLAR Agrees to Perform Official Acts and to Engage in Political Activities on Behalf of Foreign Bank-1*

83.     IMELDA CUELLAR performed little or no legitimate work in exchange for the payments funneled from Foreign Bank-1 through U.S. Affiliate-3, Individual-3, and Individual-4. Instead, in exchange for the payments, HENRY CUELLAR agreed to perform official acts and acts in violation of his official duties benefitting Foreign Bank-1 and to be and act as an agent of Foreign Bank-1 with respect to: legislative activity and regulatory and enforcement issues affecting Foreign Bank-1's ability to enter correspondent banking relationships, legislation to block regulations detrimental to the payday lending industry, and legislation relating to cross-

border electronic transfers, among other matters.  The official acts, violations of official duty, and agency activities as defined under FARA in which HENRY CUELLAR agreed to engage included:

a.      On January 9, 2015, HENRY CUELLAR emailed Executive-1 that he had met with the staff of U.S. Official-2, a high-ranking U.S. Executive Branch official, and had sent U.S. Official-2's aide a memo on "your [Executive-1's] issue."  The email attached a memorandum discussing the importance of correspondent banking relationships between U.S. and Mexican banks and urging policy action to promote such relationships, which were important to Foreign Bank-1's business.

b.      On April 17, 2015, HENRY CUELLAR emailed Executive-1 to request his "input" on a draft committee report that highlighted the problem of de-risking and directed the Department of the Treasury to "work with federal banking regulators" to "set up a regulatory framework to ensure that legitimate financial transactions are able to take place."  Two days later, HENRY CUELLAR texted Executive-1: "Did you get my email on C banking [correspondent banking]?"  Executive-1 replied: "Yes.  I will send you our suggestions later this evening. Abrazo."  Later that day, Executive-1 replied to HENRY CUELLAR's April 17, 2015, email: "Here are our suggestions, marked in red to facilitate the review process."  Executive-1 attached a revised version of the draft committee report that HENRY CUELLAR had previously sent to Executive-1.  Executive-1's revisions added, among other things, references to the importance of correspondent banking relationships, including a statement that "[t]he Committee is also aware that 'de-risking' may undermine international trade, due to the significance correspondent banking activities have on the flow of goods and services across borders."  On April 20, 2015, HENRY CUELLAR texted Executive-1: "Got your input.  I have reviewed and it's good.  I am submitting to the committee tomorrow.  I will keep you posted."  Executive-1 responded: "Muchas gracias.

33

Fuerte abrazo." On April 28, 2015, HENRY CUELLAR emailed Executive-1 to provide him

"information on the banking issue . . . in addition to the other info we have spoken about,"

attaching another version of the draft committee report.

      c.     Approximately six weeks later, on June 9, 2015, HENRY CUELLAR texted

Executive-1, "[d]id u get my email?" On June 10, 2015, Executive-1 responded, in relevant part:

"I did get your mail message. That is very a [*sic*] valuable proposal. What is the procedure it must

follow? Un abrazo." HENRY CUELLAR replied: "I am trying to add language in two different

bills. As soon as I am successful I will advise you. It's looking good." Executive-1 responded:

"Thank you so much. I will get together with [Mexican Official-1] next week. All the best." At

that time, Mexican Official-1 was serving as an intermediary between Executive-1 and HENRY

CUELLAR to negotiate the sham contract detailed above. On June 17, 2015, HENRY CUELLAR

texted Executive-1: "Language added in committee." Executive-1 replied: "Great news. Please

let me know if we can be of further help. Our dialogue with Mex and US regulators still moving

forward."

      d.     On January 23, 2016, HENRY CUELLAR texted Executive-1, asking him

who his "person in charge" of payday loans was and informing him, "[t]here is legislation that may

affect you." On February 10, 2016, one of HENRY CUELLAR's staffers sent Executive-1 an

email about H.R. 4018, the Consumer Protection and Choice Act, a bill that would prohibit the

Consumer Financial Protection Bureau from regulating payday loans for two years. The staffer

explained that HENRY CUELLAR had been "asked to co-sponsor" the bill and solicited

Executive-1's "opinion." On February 11, 2016, Executive-1 forwarded the staffer's email to the

president of U.S. Affiliate-4, the U.S.-based payday lending business affiliated with Foreign

Bank-1 through common ownership under Mexican Company-1. Executive-1 and the president

of U.S. Affiliate-4 agreed that U.S. Affiliate-4 would prepare a memo in favor of the bill for HENRY CUELLAR.

        e.      From May to July 2016, HENRY CUELLAR advised and pressured U.S. Official-3, a high-ranking Executive Branch official with responsibility for the supervision of banks, to take official acts benefitting Foreign Bank-1.  On May 26, 2016, HENRY CUELLAR, together with seven other Members of Congress, co-signed a letter to U.S. Official-3 explaining the negative economic consequences of bank de-risking and advising and pressuring him to issue "new and clear guidance" regarding risk management.  The same day, HENRY CUELLAR emailed the signed letter to Executive-1.  On July 7, 2016, HENRY CUELLAR and Senator-1 met with U.S. Official-3 regarding bank de-risking.  Talking points prepared by one of HENRY CUELLAR's staffers in advance of the meeting included a section heading "From [Executive-1]," with bullets stating Foreign Bank-1's positions on U.S. Official-3's agency's supervision and enforcement practices.  On July 11, 2016, HENRY CUELLAR texted Executive-1 to tell him that the meeting "went very well."  On September 30, 2016, HENRY CUELLAR sent Executive-1 an email in which he took credit for influencing U.S. Official-3's approach to correspondent banking and de-risking issues, stating: "Our meeting with [Senator-1] and [U.S. Official-3] is moving the discussion the [*sic*] right direction.  Un abrazo."

        f.      On October 29, 2018, Executive-2, the Mexican Conglomerate-1 legislative affairs executive, texted HENRY CUELLAR requesting a meeting to discuss "a [Mexican Conglomerate-1] delicate issue regarding the bilateral agenda on electronic transfers and national security."  HENRY CUELLAR agreed to meet Executive-2 for dinner on November 13, 2018.  On November 23, 2018, Executive-2 texted HENRY CUELLAR a document accusing one of Foreign Bank-1's competitors of engaging in "money laundering from drug trafficking, kidnapping,

extortion and terrorism financing operations." From December 2018 through June 2019, HENRY CUELLAR and Executive-2 exchanged multiple text messages and had at least one in-person meeting to discuss the "[Mexican Conglomerate-1] delicate issue." On August 14, 2019, HENRY CUELLAR and Executive-2 exchanged the following text messages:

| | |
|---|---|
| CUELLAR: | Please send me your email. The senate bill has passed and I will carry it in the house.<br>Sorry it will be passed the senate [*sic*] soon |
| Executive-2: | [Executive-2's personal email address] |
| CUELLAR: | Just emailed to you<br>It may be hard to meet today. Let's catch up later. Sorry.<br>I emailed you info. |

On August 14, 2019, HENRY CUELLAR sent two emails to Executive-2 containing the text of S.1883, the Combating Money Laundering, Terrorist Finance, and Counterfeiting Act of 2019, along with a one-page summary of the bill and a section-by-section explanation. The bill made various revisions to strengthen criminal statutes and enforcement authorities relating to money laundering, terrorist financing, and counterfeiting.

## USE OF BRIBERY PROCEEDS

84.    HENRY CUELLAR and IMELDA CUELLAR used the proceeds from the bribery schemes to satisfy their debts, pay family expenses, and make purchases. For example, they used funds from Shell Company-1 and Shell Company-2 to pay $49,053 in federal taxes and $31,662 in state and local taxes, to make over $58,000 in credit card payments and over $11,000 in car payments, to spend over $18,000 at wholesale stores and on wholesale store credit card payments, to purchase a $12,000 custom gown, to make a $7,000 down payment on a new car, to pay over $27,000 to insurance and telecom companies, and to spend tens of thousands of dollars at restaurants and retail stores.

85.     Beginning in June 2015 and continuing until at least June 2019, to further launder the funds, IMELDA CUELLAR periodically wrote checks in the amounts of $500 or $600, drawn on Shell Company-1's and Shell Company-2's accounts and made out to "Henry Cuellar" or to HENRY CUELLAR's rental business, for a total of $17,800.  These checks were purportedly for rent for an office suite in Laredo, Texas owned by HENRY CUELLAR that served as the registered address of Shell Company-1 and Shell Company-2 (the "Laredo Office Suite").  The checks were deposited into HENRY CUELLAR and IMELDA CUELLAR's personal joint account No. -7806 at U.S. Financial Institution-3, a U.S. bank, or into HENRY CUELLAR and IMELDA CUELLAR's joint U.S. Financial Institution-3 account No. -2201, which HENRY CUELLAR used for his property rental business.  These purported rent payments are summarized in the following table:

| TABLE 5:  Purported Rent Payments from IMELDA CUELLAR's Shell Companies to HENRY and IMELDA CUELLAR's Joint Personal Accounts | | | | |
|---|---|---|---|---|
| Post Date | From | To | Amount | Check Memo Line |
| 6/30/2015 | Shell Company-1 | U.S. Financial Institution-3 Account No. -2201 | $600 | Rent/January 2015 |
| 9/14/2015 | Shell Company-1 | U.S. Financial Institution-3 Account No. -2201 | $600 | Rent |
| 9/14/2015 | Shell Company-1 | U.S. Financial Institution-3 Account No. -2201 | $600 | Rent/Aug 2015 |
| 10/9/2015 | Shell Company-1 | U.S. Financial Institution-3 Account No. -2201 | $600 | Rent/Oct 2015 |
| 10/30/2015 | Shell Company-1 | U.S. Financial Institution-3 Account No. -2201 | $600 | Oct 2015 Rent |
| 12/9/2015 | Shell Company-1 | U.S. Financial Institution-3 Account No. -2201 | $600 | Rent/Dec |
| 4/5/2016 | Shell Company-1 | U.S. Financial Institution-3 Account No. -2201 | $600 | Rent |
| 4/21/2016 | Shell Company-1 | U.S. Financial Institution-3 Account No. -2201 | $600 | Rent |
| 9/8/2016 | Shell Company-1 | U.S. Financial Institution-3 Account No. -2201 | $600 | Rent |
| 9/30/2016 | Shell Company-1 | U.S. Financial Institution-3 Account No. -2201 | $600 | Oct 2016/Rent |

| 10/28/2016 | Shell Company-1 | U.S. Financial Institution-3 Account No. -2201 | $600 | Rent/Nov |
|---|---|---|---|---|
| 12/1/2016 | Shell Company-1 | U.S. Financial Institution-3 Account No. -2201 | $600 | December Rent |
| 1/5/2017 | Shell Company-1 | U.S. Financial Institution-3 Account No. -2201 | $600 | Rent/Jan 17 |
| 3/9/2017 | Shell Company-1 | U.S. Financial Institution-3 Account No. -2201 | $600 | Feb Rent |
| 3/9/2017 | Shell Company-1 | U.S. Financial Institution-3 Account No. -2201 | $600 | March Rent |
| 5/3/2017 | Shell Company-1 | U.S. Financial Institution-3 Account No. -2201 | $500 | Rent Unit 201 |
| 6/7/2017 | Shell Company-1 | U.S. Financial Institution-3 Account No. -2201 | $600 | Rent |
| 1/17/2018 | Shell Company-1 | U.S. Financial Institution-3 Account No. -7806 | $600 | Rent: Property @ [Laredo Office Suite Address] |
| 1/31/2018 | Shell Company-1 | U.S. Financial Institution-3 Account No. -7806 | $600 | Rent: February 2018 Property: [Laredo Office Suite Address] |
| 3/8/2018 | Shell Company-1 | U.S. Financial Institution-3 Account No. -7806 | $600 | Rent: Property March 2018 @ [Laredo Office Suite Address] |
| 3/13/2018 | Shell Company-2 | U.S. Financial Institution-3 Account No. -7806 | $500 | Rent/[Laredo Office Suite Address] |
| 4/17/2018 | Shell Company-1 | U.S. Financial Institution-3 Account No. -7806 | $600 | Rent: [Laredo Office Suite Address] |
| 8/8/2018 | Shell Company-2 | U.S. Financial Institution-3 Account No. -7806 | $600 | Rent |
| 11/29/2018 | Shell Company-2 | U.S. Financial Institution-3 Account No. -7806 | $600 | Rent / December '18 |
| 12/31/2018 | Shell Company-2 | U.S. Financial Institution-3 Account No. -7806 | $600 | Rent [Laredo Office Suite Number] |
| 3/21/2019 | Shell Company-2 | U.S. Financial Institution-3 Account No. -7806 | $600 | Rent March 2019 [Laredo Office Suite Number] |
| 4/11/2019 | Shell Company-2 | U.S. Financial Institution-3 Account No. -7806 | $600 | Rent |
| 4/23/2019 | Shell Company-2 | U.S. Financial Institution-3 Account No. -2201 | $600 | Rent |
| 6/3/2019 | Shell Company-2 | U.S. Financial Institution-3 Account No. -7806 | $600 | [Laredo Office Suite Number] Rent |
| 6/21/2019 | Shell Company-2 | U.S. Financial Institution-3 Account No. -7806 | $600 | Rent: July 2019 [Laredo Office Suite Number] |
| **TOTAL** | | | **$17,800** | |

**COUNT ONE**
Conspiracy – Azerbaijan Scheme
(18 U.S.C. § 371)

86.     Paragraphs 1 to 45 and 84 to 85 of the Indictment are realleged and incorporated by reference as though fully set forth herein.

87.     Beginning no later than February 2014 and continuing until at least September 2021, in the Southern District of Texas and elsewhere, the defendants, HENRY CUELLAR and IMELDA CUELLAR, together with others known and unknown, did knowingly and unlawfully combine, conspire, confederate, and agree together and with each other, to commit the following offenses against the United States:

        a.      for HENRY CUELLAR, being a public official, that is, a Member of the United States House of Representatives, to directly and indirectly, corruptly demand, seek, receive, accept, and agree to receive and accept anything of value personally and for any other person and entity, that is, at least $360,000 from Foreign Oil Company-1, in return for being influenced in the performance of an official act and for being induced to do and to omit to do an act in violation of his official duty, in violation of Title 18, United States Code, Section 201(b); and

        b.      to have a public official, that is, HENRY CUELLAR, be and act as an agent of a foreign principal, that is, the Government of Azerbaijan, required to register under FARA, Title 22, United States Code, Sections 611 *et seq.*, in violation of Title 18, United States Code, Section 219.

***Purposes of the Conspiracy***

88.     It was a purpose of the conspiracy for the defendants to use HENRY CUELLAR's official position as a Member of the United States House of Representatives to benefit and enrich themselves through bribery and through HENRY CUELLAR acting as an agent of a foreign principal required to register under FARA.

89.     It was further a purpose of the conspiracy to conceal HENRY CUELLAR and IMELDA CUELLAR's unlawful activities from the public, the United States, and law-enforcement authorities.

### *Manner and Means of the Conspiracy*

90.     The manner and means by which the defendants and others carried out the conspiracy included, but were not limited to, the following:

91.     HENRY CUELLAR and IMELDA CUELLAR negotiated a series of sham contracts between Foreign Oil Company-1-affiliated entities and IMELDA CUELLAR's shell companies that purported to be for strategic consulting and advising services, pursuant to which IMELDA CUELLAR did little or no legitimate work.

92.     HENRY CUELLAR and IMELDA CUELLAR solicited and accepted at least $360,000 from Foreign Oil Company-1, funneled through Foreign Oil Company-1-affiliated entities to IMELDA CUELLAR's shell companies.

93.     In exchange for the payments, HENRY CUELLAR agreed to perform official acts and acts in violation of his official duties benefitting Azerbaijan and to be and act as an agent of the Government of Azerbaijan, a foreign principal as defined by FARA, with respect to the matters detailed in Paragraph 45 of this Indictment, among others, as opportunities arose.

94.     HENRY CUELLAR and IMELDA CUELLAR concealed the payments from the public, the United States, and law-enforcement authorities by, among other things, funneling them through third-party entities pursuant to sham consulting contracts and then using the proceeds for purported rent payments to HENRY CUELLAR.

*Overt Acts*

95.     In furtherance of the conspiracy and to effect its illegal objects, the overt acts alleged in paragraphs 21 to 45 and 84 to 85 of the Indictment, among others, were committed and caused to be committed in the Southern District of Texas and elsewhere, including but not limited to the following:

a.      On November 26, 2014, Foreign Oil Company-1 caused Azerbaijani Company-1 to wire $60,000 from its account in Azerbaijan to U.S. Affiliate-1's U.S. Financial Institution-1 account No. -8952, opened in Houston, Texas.

b.      On December 1, 2014, U.S. Affiliate-1 wired $60,000 from its U.S. Financial Institution-1 account No. -8952, opened in Houston, Texas, to Shell Company-1's U.S. Financial Institution-1 account No. -5101, opened in Laredo, Texas.

c.      On June 25, 2015, Foreign Oil Company-1 caused Azerbaijani Company-1 to make a $60,000 bribe payment to Shell Company-1's U.S. Financial Institution-1 account No. -5101, opened in Laredo, Texas, via an international wire transfer.

d.      On January 9, 2019, Individual-2 deposited a check from U.S. Company-1 in the amount of $30,000 into Shell Company-2's U.S. Financial Institution-2 account No. -6162, opened in Laredo, Texas.

e.      On March 19, 2019, Individual-2 deposited a check from U.S. Affiliate-2 in the amount of $30,000 into Shell Company-2's U.S. Financial Institution-2 account No. -6162, opened in Laredo, Texas.

f.      On July 5, 2020, while located in Laredo, Texas, HENRY CUELLAR texted Azerbaijani Diplomat-1, promising to attempt to "add Rider on bases."

g.      On July 18, 2020, while located in Laredo, Texas, HENRY CUELLAR texted Azerbaijani Diplomat-1: "I have another amendment I may add this week."

h.      On July 22, 2020, while located in Laredo, Texas, HENRY CUELLAR texted Azerbaijani Diplomat-1 a tweet from the Armenian Assembly reporting that HENRY CUELLAR had withdrawn an amendment blocking funding to certain autonomous regions, such as the Nagorno-Karabakh region.

All in violation of Title 18, United States Code, Section 371.

## COUNT TWO
Bribery – Azerbaijan Scheme
(18 U.S.C. §§ 201(b) & 2)

96.      Paragraphs 1 to 9, 12 to 45, and 84 to 85 of the Indictment are realleged and incorporated by reference as though fully set forth herein.

97.      Beginning no later than February 2014 and continuing until at least September 2021, in the Southern District of Texas and elsewhere, the defendant, HENRY CUELLAR, being a public official, aided and abetted by the defendant, IMELDA CUELLAR, did directly and indirectly, corruptly demand, seek, receive, accept, and agree to receive and accept anything of value personally and for any other person and entity, in return for being influenced in the performance of an official act and for being induced to do and omit to do any act in violation of his official duty, that is, HENRY CUELLAR, a Member of the United States House of Representatives, demanded, sought, received, accepted, and agreed to receive and accept from Foreign Oil Company-1 at least $360,000 in return for being influenced in the performance of official acts and for being induced to do and omit to do acts in violation of his official duty relating to the matters detailed in Paragraph 45 of this Indictment, among others, as opportunities arose.

All in violation of Title 18, United States Code, Sections 201(b) and 2.

**COUNT THREE**
Honest Services Wire Fraud Conspiracy – Azerbaijan Scheme
(18 U.S.C. § 1349)

98.     Paragraphs 1 to 9, 12 to 45, and 84 to 85 of the Indictment are realleged and incorporated by reference as though fully set forth herein.

99.     Beginning no later than February 2014 and continuing until at least September 2021, in the Southern District of Texas and elsewhere, the defendants, HENRY CUELLAR and IMELDA CUELLAR, together with others known and unknown, did knowingly and unlawfully combine, conspire, confederate, and agree together and with each other to devise and intend to devise a scheme and artifice to defraud and to deprive, by means of material false and fraudulent pretenses, representations, and promises, the United States and the citizens of Texas's 28th Congressional District, of their right to the honest services of HENRY CUELLAR, a Member of the United States House of Representatives, through bribery to influence HENRY CUELLAR's official acts and to induce him to do and to omit to do acts in violation of his official duty, and to knowingly and intentionally transmit and cause to be transmitted by means of wire communications in interstate and foreign commerce writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice.

100.    In furtherance of the scheme to defraud and deprive, and to accomplish its purposes, the acts alleged in paragraphs 21 to 45 and 84 to 85 of the Indictment, among others, were committed and caused to be committed in the Southern District of Texas and elsewhere, including but not limited to the following:

a.     On January 14, 2019, check No. 1032 in the amount of $30,000 drawn on U.S. Financial Institution-2 account No. -5942, held by U.S. Company-1, was deposited into U.S. Financial Institution-2 account -6162, held by Shell Company-2, causing wire transmissions in interstate commerce.

b.      On March 21, 2019, check No. 1027 in the amount of $30,000 drawn on U.S. Financial Institution-2 account No. -5260, held by U.S. Affiliate-2, was deposited into U.S. Financial Institution-2 account No. -6162, held by Shell Company-2, causing wire transmissions in interstate commerce.

All in violation of Title 18, United States Code, Section 1349.

### COUNT FOUR
Public Official Acting as an Agent of a Foreign Principal – Azerbaijan Scheme
(18 U.S.C. §§ 219 & 2)

101.    Paragraphs 1 to 45 and 84 to 85 of the Indictment are realleged and incorporated by reference as though fully set forth herein.

102.    Beginning no later than February 2014 and continuing until at least September 2021, in the Southern District of Texas and elsewhere, the defendant, HENRY CUELLAR, being a public official, aided and abetted by the defendant, IMELDA CUELLAR, knowingly was and acted as an agent of a foreign principal required to register under the Foreign Agents Registration Act of 1938, that is, HENRY CUELLAR agreed to and did act as an agent of the Government of Azerbaijan by agreeing to perform the acts detailed in Paragraph 45 of this Indictment, and other acts as opportunities arose.

All in violation of Title 18, United States Code, Sections 219 and 2.

### COUNT FIVE
Conspiracy – Foreign Bank-1 Scheme
(18 U.S.C. § 371)

103.    Paragraphs 1 to 11 and 46 to 85 of the Indictment are realleged and incorporated by reference as though fully set forth herein.

104.    Beginning no later than May 2014 and continuing until at least November 2021, in the Southern District of Texas and elsewhere, the defendants, HENRY CUELLAR and IMELDA CUELLAR, together with others known and unknown, did knowingly and unlawfully combine,

conspire, confederate, and agree together and with each other, to commit the following offenses against the United States:

a.       for HENRY CUELLAR, being a public official, that is, a Member of the United States House of Representatives, to directly and indirectly, corruptly demand, seek, receive, accept, and agree to receive and accept anything of value personally and for any other person and entity, that is, at least $238,390 from Foreign Bank-1, in return for being influenced in the performance of an official act and for being induced to do and to omit to do an act in violation of his official duty, in violation of Title 18, United States Code, Section 201(b); and

b.       to have a public official, that is, HENRY CUELLAR, be and act as an agent of a foreign principal, that is, Foreign Bank-1, required to register under FARA, Title 22, United States Code, Sections 611 *et seq.*, in violation of Title 18, United States Code, Section 219.

### *Purposes of the Conspiracy*

105.    It was a purpose of the conspiracy for the defendants to use HENRY CUELLAR's official position as a Member of the United States House of Representatives to benefit and enrich themselves through bribery and through HENRY CUELLAR acting as an agent of a foreign principal required to register under FARA.

106.    It was further a purpose of the conspiracy to conceal HENRY CUELLAR and IMELDA CUELLAR's unlawful activities from the public, the United States, and law-enforcement authorities.

### *Manner and Means of the Conspiracy*

107.    The manner and means by which the defendants and others carried out the conspiracy included, but were not limited to, the following:

108.     HENRY CUELLAR and IMELDA CUELLAR negotiated a sham contract between U.S. Affiliate-3 and Consulting Company-1 that purported to be for strategic consulting and advising services, pursuant to which IMELDA CUELLAR did little or no legitimate work.

109.     HENRY CUELLAR recruited and directed Individual-3 and Individual-4 to serve as middlemen to further launder the funds.

110.     HENRY CUELLAR and IMELDA CUELLAR solicited and accepted at least $238,390 from Foreign Bank-1, funneled through U.S. Affiliate-3, Consulting Company-1, and Consulting Company-3.

111.     In exchange for the payments, HENRY CUELLAR agreed to perform official acts and acts in violation of his official duties benefitting Foreign Bank-1 and to be and act as an agent of Foreign Bank-1, a foreign principal as defined by FARA, with respect to the matters detailed in Paragraph 83 of this Indictment, among others, as opportunities arose.

112.     HENRY CUELLAR and IMELDA CUELLAR concealed the payments from the public, the United States, and law enforcement authorities by, among other things, funneling them through third party entities pursuant to sham consulting contracts and then using the proceeds for purported rent payments to HENRY CUELLAR.

*Overt Acts*

113.     In furtherance of the conspiracy and to effect its illegal objects, the overt acts alleged in paragraphs 55 to 85 of the Indictment, among others, were committed and caused to be committed in the Southern District of Texas and elsewhere, including but not limited to:

a.     On November 15, 2015, HENRY CUELLAR and Individual-3 met at a restaurant in Laredo, Texas, to discuss how the proceeds of the sham agreement would be divided among Individual-3, Individual-4, Mexican Official-1, and IMELDA CUELLAR.

46

b.      On January 9, 2019, U.S. Affiliate-3 wired $15,000 to Consulting Company-1's U.S. Financial Institution-2 account No. -4303.

c.      On June 13, 2019, a check in the amount of $3,000 from Consulting Company-3 was deposited into Shell Company-1's U.S. Financial Institution-1 account No. -5101, opened in Laredo, Texas.

d.      On June 29, 2019, a check in the amount of $7,000, drawn on Consulting Company-1's U.S. Financial Institution-2 account No. -4303, was deposited into Consulting Company-3's U.S. Financial Institution-4 account No. -1672.

e.      On August 14, 2019, while located in Laredo, Texas, HENRY CUELLAR texted Executive-2, "Going to DF [Mexico City] today until tomorrow.  Maybe we can talk?"

f.      On August 14, 2019, while located in Houston, Texas, HENRY CUELLAR texted Executive-2, "Please send me your email.  The senate bill has passed and I will carry it in the house."

g.      On August 14, 2019, while located in Houston, Texas, HENRY CUELLAR sent Executive-2 two emails containing the text of S.1883, the Combating Money Laundering, Terrorist Finance, and Counterfeiting Act of 2019, along with a one-page summary of the bill and a section-by-section explanation.

All in violation of Title 18, United States Code, Section 371.

## COUNT SIX
### Bribery – Foreign Bank-1 Scheme
### (18 U.S.C. §§ 201(b) & 2)

114.    Paragraphs 1 to 9 and 46 to 85 of the Indictment are realleged and incorporated by reference as though fully set forth herein.

115.    Beginning no later than May 2014 and continuing until at least November 2021, in the Southern District of Texas and elsewhere, the defendant, HENRY CUELLAR, being a public

official, aided and abetted by the defendant, IMELDA CUELLAR, did directly and indirectly, corruptly demand, seek, receive, accept, and agree to receive and accept anything of value personally and for any other person and entity, in return for being influenced in the performance of an official act and for being induced to do and omit to do any act in violation of his official duty, that is, HENRY CUELLAR, a Member of the United States House of Representatives, demanded, sought, received, accepted, and agreed to accept and receive from Foreign Bank-1 at least $238,390 in return for being influenced in the performance of official acts and for being induced to do and omit to do acts in violation of his official duty relating to the matters detailed in Paragraph 83 of this Indictment, among others, as opportunities arose.

All in violation of Title 18, United States Code, Sections 201(b) and 2.

### COUNT SEVEN
Honest Services Wire Fraud Conspiracy – Foreign Bank-1 Scheme
(18 U.S.C. § 1349)

116.    Paragraphs 1 to 9 and 46 to 85 of the Indictment are realleged and incorporated by reference as though fully set forth herein.

117.    Beginning no later than May 2014 and continuing until at least September 2021, in the Southern District of Texas and elsewhere, the defendants, HENRY CUELLAR and IMELDA CUELLAR, together with others known and unknown, did knowingly and unlawfully combine, conspire, confederate, and agree together and with each other to devise and intend to devise a scheme and artifice to defraud and to deprive, by means of material false and fraudulent pretenses, representations, and promises, the United States and the citizens of Texas's 28th Congressional District, of their right to the honest services of HENRY CUELLAR, a Member of the United States House of Representatives, through bribery to influence HENRY CUELLAR's official acts and to induce him to do and to omit to do acts in violation of his official duty, and to knowingly and intentionally transmit and cause to be transmitted by means of wire communications in interstate

and foreign commerce writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice.

118.    In furtherance of the scheme to defraud and deprive, and to accomplish its purposes, the acts alleged in paragraphs 55 to 85 of the Indictment, among others, were committed and caused to be committed in the Southern District of Texas and elsewhere, including but not limited to the following:

a.    On June 13, 2019, U.S. Financial Institution-4 cashier's check No. 1107079 in the amount of $3,000 was deposited into U.S. Financial Institution-1 account No. -5101, held by Shell Company-1, causing wire transmissions in interstate commerce.

b.    On June 29, 2019, check No. 1832 in the amount of $7,000 drawn on U.S. Financial Institution-2 account No. -4304, held by Consulting Company-1, was deposited into U.S. Financial Institution-4 account No. -1672, held by Consulting Company-3, causing wire transmissions in interstate commerce.

All in violation of Title 18, United States Code, Section 1349.

## COUNT EIGHT
Public Official Acting as an Agent of a Foreign Principal – Foreign Bank-1 Scheme
(18 U.S.C. §§ 219 & 2)

119.    Paragraphs 1 to 11 and 46 to 85 of the Indictment are realleged and incorporated by reference as though fully set forth herein.

120.    Beginning no later than May 2014 and continuing until at least November 2021, in the Southern District of Texas and elsewhere, the defendant, HENRY CUELLAR, being a public official, aided and abetted by the defendant, IMELDA CUELLAR, knowingly was and acted as an agent of a foreign principal required to register under the Foreign Agents Registration Act of 1938, that is, HENRY CUELLAR agreed to and did act as an agent of Foreign Bank-1 by agreeing

to perform the acts detailed in Paragraph 83 of this Indictment, and other acts as opportunities arose.

All in violation of Title 18, United States Code, Sections 219 and 2.

## COUNT NINE
Money Laundering Conspiracy
(18 U.S.C. § 1956(h))

121.    Paragraphs 1 to 9 and 12 to 85 of the Indictment are realleged and incorporated by reference as though fully set forth herein.

122.    Beginning no later than February 2014 and continuing until at least November 2021, in the Southern District of Texas and elsewhere, the defendants, HENRY CUELLAR and IMELDA CUELLAR, together with others known and unknown, did knowingly and unlawfully combine, conspire, confederate, and agree together and with each other to commit offenses in violation of Title 18, United States Code, Section 1956(a)(1)(B)(i), that is, to knowingly conduct and attempt to conduct financial transactions affecting interstate and foreign commerce and involving the use of a financial institution which is engaged in, and the activities of which affect, interstate and foreign commerce, knowing that the property involved in the financial transactions represented the proceeds of some form of unlawful activity, which transactions in fact involved the proceeds of specified unlawful activity, that is, bribery of a federal official in violation of Title 18, United States Code, Section 201(b), honest services wire fraud in violation of Title 18, United States Code, Sections 1343 and 1346, and having a public official be or act as an agent of a foreign principal required to register under FARA in violation of Title 18, United States Code, Section 219, knowing that the transactions were designed in whole and in part to conceal and disguise the nature, location, source, ownership, and control of the proceeds of specified unlawful activity.

123.    The manner and means by which the defendants and others carried out the conspiracy included, but were not limited to, the financial transactions described in paragraphs 27, 30, 35, 41 to 42, 75 to 80, 82, and 85, and Tables 1 to 5 of the Indictment.

All in violation of Title 18, United States Code, Section 1956(h).

## COUNTS TEN THROUGH FOURTEEN
Money Laundering
(18 U.S.C. §§ 1956(a)(1)(B)(i) & 2)

124.    Paragraphs 1 to 9 and 12 to 85 of the Indictment are realleged and incorporated by reference as though fully set forth herein.

125.    On the dates listed below, in the Southern District of Texas and elsewhere, the defendants, HENRY CUELLAR and IMELDA CUELLAR, aiding and abetting each other, knowing that the property involved in the financial transactions listed below represented the proceeds of some form of unlawful activity, did knowingly conduct and attempt to conduct the financial transactions listed below, which in fact involved the proceeds of a specified unlawful activity, that is, bribery of a federal official, in violation of Title 18, United States Code, Section 201(b), honest services wire fraud in violation of Title 18, United States Code, Sections 1343 and 1346, and having a public official be or act as an agent of a foreign principal required to register under FARA in violation of Title 18, United States Code, Section 219, each transaction affecting interstate commerce and involving the use of a financial institution which is engaged in, and the activities of which affect, interstate and foreign commerce, and knowing the transactions were designed in whole and in part to conceal and disguise the nature, the location, the source, the ownership, and the control of the proceeds of the specified unlawful activity, each such transaction constituting a separate count:

| Count | Date | Financial Transaction |
|-------|------|----------------------|
| 10 | 3/21/2019 | Deposit, in Laredo, Texas, of Check No. 1206, in the amount of $600, drawn on U.S. Financial Institution-2 account No. -6162, held by Shell Company-2, into U.S. Financial Institution-3 account No. -7806, held jointly by HENRY CUELLAR and IMELDA CUELLAR, with memo line "Rent March 2019 [Laredo Office Suite Number]" |
| 11 | 4/11/2019 | Deposit, in Laredo, Texas, of Check No. 1208, in the amount of $600, drawn on U.S. Financial Institution-2 account No. -6162, held by Shell Company-2, into U.S. Financial Institution-3 account No. -7806, held jointly by HENRY CUELLAR and IMELDA CUELLAR, with memo line "Rent" |
| 12 | 4/23/2019 | Deposit, in Laredo, Texas, of Check No. 1222, in the amount of $600, drawn on U.S. Financial Institution-2 account No. -6162, held by Shell Company-2, into U.S. Financial Institution-3 account No. -2201, held jointly by HENRY CUELLAR and IMELDA CUELLAR, with memo line "Rent" |
| 13 | 6/3/2019 | Deposit, in Laredo, Texas, of Check No. 1236, in the amount of $600, drawn on U.S. Financial Institution-2 account No. -6162, held by Shell Company-2, into U.S. Financial Institution-3 account No. -7806, held jointly by HENRY CUELLAR and IMELDA CUELLAR, with memo line "[Laredo Office Suite Number] Rent" |
| 14 | 6/21/2019 | Deposit, in Laredo, Texas, of Check No. 1282, in the amount of $600, drawn on U.S. Financial Institution-2 account No. -6162, held by Shell Company-2, into U.S. Financial Institution-3 account No. -7806, held jointly by HENRY CUELLAR and IMELDA CUELLAR, with memo line "Rent: July 2019 [Laredo Office Suite Number]" |

All in violation of Title 18, United States Code, Section 1956(a)(1)(B)(i) and 2.

### NOTICE OF FORFEITURE
(28 U.S.C. § 2461(c); 18 U.S.C. § 981(a)(1)(C); 18 U.S.C. § 982(a)(1))

126.    Pursuant to Title 28, United States Code, Section 2461(c) and Title 18, United States Code, Section 981(a)(1)(C), the United States gives notice to Defendants HENRY CUELLAR and IMELDA CUELLAR that in the event of their conviction of any of the offenses charged in Counts One through Eight of this Indictment, all property, real or personal, which represents or is traceable to the gross receipts obtained, directly or indirectly, from such offense, is subject to forfeiture.

127.     Pursuant to Title 18, United States Code, Section 982(a)(1), the United States gives notice to Defendants HENRY CUELLAR and IMELDA CUELLAR that upon conviction of the offenses charged in Counts Nine through Fourteen of this Indictment, all property, real or personal, involved in money laundering offenses or traceable to such property, is subject to forfeiture.

128.     Defendants HENRY CUELLAR and IMELDA CUELLAR are notified that upon conviction, a money judgment may be imposed equal to the total value of the property subject to forfeiture.

129.     Defendants HENRY CUELLAR and IMELDA CUELLAR are notified that in the event that property subject to forfeiture, as a result of any act or omission of a defendant,

(A) cannot be located upon the exercise of due diligence;

(B) has been transferred or sold to, or deposited with, a third party;

(C) has been placed beyond the jurisdiction of the court;

(D) has been substantially diminished in value; or

(E) has been commingled with other property that cannot be divided without difficulty,

the United States will seek to forfeit any other property of the defendant up to the total value of the property subject to forfeiture pursuant to Title 21, United States Code, Section 853(p), as incorporated by reference in Title 28, United States Code, Section 2461(c) and Title 18, United States Code, Section 982(b)(1).

A TRUE BILL:

**Original Signature on File**

FOREPERSON

COREY R. AMUNDSON
Chief, Public Integrity Section
Criminal Division
U.S. Department of Justice

By: _____
Marco A. Palmieri
Rosaleen O'Gara
Celia Choy
Attorneys for the United States

JENNIFER KENNEDY GELLIE
Executive Deputy Chief
    performing the duties of Chief
Counterintelligence and Export Control Section
National Security Division
U.S. Department of Justice

By: _____
Garrett Coyle
Attorney for the United States

54