United States District Court
Southern District of Texas
**ENTERED**
September 20, 2025
Nathan Ochsner, Clerk

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | § | |
| | § | |
| Plaintiff, | § | |
| | § | CRIMINAL ACTION NO. H-24-cr-224 |
| v. | § | |
| | § | |
| ENRIQUE ROBERTO "HENRY" | § | |
| CUELLAR and IMELDA RIOS | § | |
| CUELLAR, | § | |
| | § | |
| Defendants. | § | |

**MEMORANDUM AND OPINION**

A grand jury indicted Enrique "Henry" Cuellar and Imelda Rios Cuellar with engaging in a scheme in which Henry Cuellar performed official acts as a member of the House of Representatives in exchange for payment from an oil and gas company owned and controlled by the Azerbaijani government and from a Mexican bank. Henry Cuellar asserts immunity from prosecution under the Speech or Debate Clause and moves to dismiss the indictment. (Docket Entry No. 87). Cuellar argues that the indictment's reliance on his consideration of prospective bills, plans to introduce amendments to bills, drafts of speeches to be given on the floor of the House of Representatives, and internal communications and deliberations about future votes or other legislative acts, (*id.* at 2–3), reveals the government's improper attempt to "question[]" him in another "Place" about his "Speech or Debate" in the "House" of Representatives, U.S. CONST. art. I, § 6, cl. 1. Cuellar argues that the indictment allegations and charges are so intertwined with his official, legislative acts that the government cannot proceed with this prosecution without infringing on the parliamentary privilege that the Speech or Debate Clause codifies. (Docket Entry No. 87 at 11–16; *see also* Docket Entry No. 105 at 1–4).

Based on a careful review of the indictment; the motion to dismiss, the response, and reply; the record; and the applicable law, and with the benefit of oral argument, the court denies the motion to dismiss. (Docket Entry No. 87). The reasons are explained below.

## I.    Background

The indictment alleges that while serving as a member of Congress, Henry Cuellar engaged in an illegal scheme to accept bribes from two foreign entities: (1) an oil and gas company owned and controlled by the Government of Azerbaijan; and (2) a foreign bank headquartered in Mexico City. (Docket Entry No. 1 ¶¶ 1–3). The indictment alleges that the bribe payments were laundered through sham consulting contracts into shell companies owned by Imelda Cuellar. (*Id.*). The indictment alleges that Henry Cuellar agreed to perform official acts in his capacity as an elected member of Congress with the intent to further the interests of the Government of Azerbaijan and of the foreign bank. (*Id.*). The indictment also alleges that Henry Cuellar promised to influence United States foreign policy in favor of Azerbaijan and to influence federal regulation of the financial industry to benefit the bank and its affiliates. (*Id.*). The indictment charges Henry Cuellar and Imelda Cuellar with conspiracy under 18 U.S.C. § 371 (Counts 1 and 5); bribery under 18 U.S.C. § 201 (Counts 2 and 6); honest-services wire fraud under 18 U.S.C. § 1349 (Counts 3 and 7); conspiracy to commit money laundering under 18 U.S.C. § 1956(h) (Count 9); and money laundering under 18 U.S.C. § 1956(a)(1)(B)(i), (a)(2) (Counts 10–14).[1]

Henry Cuellar argues that the Constitution's Speech or Debate Clause prohibits the government from prosecuting him for this alleged scheme because the alleged misconduct is the performance of official, legislative acts. (Docket Entry No. 87). Cuellar identifies sixteen

---

[1] On the government's motion, the court dismissed Counts 4 and 8, which alleged violations of the Foreign Agent Registration Act, 18 U.S.C. § 219. (Docket Entry No. 138).

allegations that he argues violate the Speech or Debate Clause.  He describes them in his brief, as follows:

1.  ¶ 45(a): The Congressman "[p]laced language within that year's National Defense Authorization Act."

2.  ¶ 45(b): The Congressman was given talking points regarding a "potential amendment" to a bill under consideration in the House of Representatives for use during the debate of the bill.

3.  ¶ 45(c): The Congressman's summary of "funding measures in the State, Foreign Operations and Related Programs Appropriations Bills" that he was working on in the House of Representatives.

4.  ¶ 45(d): The Congressman's staff made efforts to solicit input on a House Appropriations Committee Report.

5.  ¶ 45(d): The Congressman reviewed and deliberated on the language in the Appropriations Committee Report.

6.  ¶ 45(e): The Congressman discussed the text of a speech he intended to give on the floor of the House of Representatives.

7.  ¶ 45(g): The Congressman communicated that he had "submitted language" related to his work.

8.  ¶ 45(h): The Congressman had communications about an amendment to the Department of Interior, Environment, and Related Agencies Appropriations Act for Fiscal Year 2018, a bill that was before the House.

9.  ¶ 45(j): The Congressman communicated about a resolution under consideration by a committee of the House of Representatives and his efforts to oppose the amendment.

10. ¶ 45(k): The Congressman communicated about adding an amendment to a bill in the House of Representatives.

11. ¶ 45(l): The Congressman worked on the House Appropriations Committee regarding the Nagorno-Karabakh conflict.

12. ¶ 45(m): The Congressman worked on a proposed amendment to the State, Foreign Operations, and Related Programs Appropriations Act for Fiscal Year 2021.

13. ¶ 83(b): The Congressman communicated and deliberated about a House of Representatives Committee report regarding banking de-risking.

14. ¶ 83(c): The Congressman communicated and deliberated about amendments to bills under consideration by the House of Representatives.

15. ¶ 83(d): The Congressman's staffers communicated about "H.R. 4018, the Consumer Protection and Choice Act," which was being considered by the House of Representatives and which Congressman Cuellar had been asked to co-sponsor.

16. ¶ 83(f): The Congressman discussed a de-risking bill he intended to carry in the House of Representatives, his meetings with a United States Senator about the bill's topic, and talking points prepared by the Congressman's staff.

(Docket Entry No. 87 at 2 n.1).

Cuellar contends that the government can neither indict nor try him based on these allegations and accordingly moves to dismiss. The government responds by arguing that the sixteen challenged allegations are not protected legislative acts; and that, even if the Speech or Debate Clause protected the conduct alleged, the government can prove Cuellar's guilt without relying on the allegations that Cuellar challenges. (*See generally* Docket Entry No. 103).

## II.    The Legal Standard

A criminal defendant may move to dismiss based on a "defect in the indictment," such as a "failure to state an offense." FED. R. CRIM. P. 12(b)(3)(B)(v). This rule includes constitutional challenges to a prosecution, such as assertions of immunity. *See, e.g.*, *Trump v. United States*, 603 U.S. 593, 603–04 (2024). In deciding a motion to dismiss, the court must accept the allegations in the indictment as true and determine whether the defendant is entitled to the requested relief as a matter of law. *United States v. Mann*, 517 F.2d 259, 266–67 (5th Cir. 1975).

## III.    Analysis

The Speech or Debate Clause states that "for any Speech or Debate in either House, [Senators and Representatives] shall not be questioned in any other Place." U.S. CONST. art. I, § 6,

cl. 1. The privilege provided in the Clause derives "from the practice of the British Parliament, and was in full exercise in our colonial legislatures, and now belongs to the legislature of every State in the Union as matter of constitutional right." 1 JOSEPH STORY, COMMENTARIES ON THE CONSTITUTION OF THE UNITED STATES § 865, at 610 (Thomas M. Cooley ed., Bos., Little, Brown & Co. 4th ed. 1873); *see also Kent v. Ohio House of Representatives Democratic Caucus*, 33 F.4th 359, 361–64 (6th Cir. 2022) (providing an overview of the privilege's history). The Constitutional Convention approved the Speech or Debate Clause without dissent, and there was little debate over it throughout the ratification period. *United States v. Johnson*, 383 U.S. 169, 177 (1966) (first citing 5 THE DEBATES IN THE SEVERAL STATE CONVENTIONS ON THE ADOPTION OF THE FEDERAL CONSTITUTION 406 (Jonathan Elliot ed., 2d ed. 1836); and then citing 2 THE RECORDS OF THE FEDERAL CONVENTION OF 1787 246 (Max Farrand ed., 1911)).

The Founders regarded this "freedom of speech and debate" as "vital" to the success of the new Republic. STORY, *supra*, § 865, at 610. They considered the "freedom" an essential element of democratic self-governance, enabling elected officials to represent their constituents in legislative business without fear of reprisal or punishment for advocating unpopular positions. *See Coffin v. Coffin*, 4 Mass. (4 Tyng) 1, 27 (1808) (Parsons, C.J.) (explaining that the privilege "support[s] the rights of the people, by enabling their representatives to execute the functions of their office without fear of prosecutions, civil or criminal"); *Eastland v. U.S. Servicemen's Fund*, 421 U.S. 491, 502–03 (1975) (similar). The Founders also recognized that codifying the privilege would buttress the Constitution's tripartite design and the separation of powers: immunity from both testimony and suit would safeguard legislators against both overzealous executives and hostile judges. *See United States v. Brewster*, 408 U.S. 501, 525 (1972); *see also* THE FEDERALIST NO. 48, at 256 (James Madison) (George W. Carey & James McClellan eds., 2001). These dual

aims, anchored in the Constitution's purpose and structure, demonstrate that the Speech or Debate Clause protects the right to representative and limited government, not "the personal or private benefit of Members of Congress." *Brewster*, 408 U.S. at 507; *accord Tenney v. Brandhove*, 341 U.S. 367, 376–77 (1951).

The Speech or Debate Clause privilege is potent.  The Clause provides legislators immunity from suit, *Eastland*, 421 U.S. at 503, immunity from liability, *Gravel v. United States*, 408 U.S. 606, 615 (1972), and an exclusionary rule against the use of "evidence of a legislative act" in a prosecution or before a grand jury, *United States v. Helstoski (Helstoski I)*, 442 U.S. 477, 487 (1979); *see Gravel*, 408 U.S. at 621–22 (allowing legislators to bar testimony from their aides about legislative acts).  These privileges are "absolute."  *Eastland*, 421 U.S. at 501.  The Clause "fall[s] like an iron curtain" over any aspect of a criminal case within its scope.  *United States v. Renzi*, 651 F.3d 1012, 1025 (9th Cir. 2011).

Because the privilege is so potent, courts must tread cautiously and "closely scrutinize[]" defendants' invocations of the Clause to ensure that its applications do not go "beyond what is needed to protect legislative independence."  *Hutchinson v. Proxmire*, 443 U.S. 111, 126–27 (1979).  This requires a delicate balance.  Courts must "read" the Clause both "broadly" enough "to effectuate its purpose of protecting the independence of the Legislative Branch" and narrowly enough to ensure that it does not "make Members of Congress super-citizens, immune from criminal responsibility."  *Brewster*, 408 U.S. at 516.  As Thomas Jefferson put it, the question is whether the conduct underlying a suit against a legislator is of the sort that "exceed[s] the bounds and limits of his place and duty."  THOMAS JEFFERSON, A MANUAL OF PARLIAMENTARY PRACTICE FOR THE USE OF THE SENATE OF THE UNITED STATES § 3, at 16 (Washington, Samuel Harrison Smith 1801); *see* STORY, *supra*, § 865, at 610–11 ("[T]his privilege is strictly confined to things

done in the course of parliamentary proceedings, and does not cover things done beyond the place and limits of duty.").

Modern doctrine frames the inquiry in terms of "legislative activity." *Gravel*, 408 U.S. at 625. This framing is broader than "Speech or Debate" and can encompass official acts that are not strictly "in either House." U.S. CONST. art. I, § 6, cl. 1; *see In re Grand Jury Subpoenas*, 571 F.3d 1200, 1205 (D.C. Cir. 2009) (Kavanaugh, J., concurring). From the early days of the Republic, courts have consistently recognized that legislative activity includes the "things generally done in a session of the House by one of its members in relation to the business before it." *Kilbourn v. Thompson*, 103 U.S. 168, 204 (1880); *accord Coffin*, 4 Mass. (4 Tyng) at 27 (explaining that the privilege extends "to the giving of a vote, to the making of a written report, and to every other act resulting from the nature, and in the execution, of the office"). But legislative acts do not encompass "all things in any way related to the legislative process," *Brewster*, 408 U.S. at 516, even if members of Congress "perform" legislative-related acts "in their official capacity," *Gravel*, 408 U.S. at 625; *see Fields v. Off. of Eddie Bernice Johnson*, 459 F.3d 1, 12–13 (D.C. Cir. 2006) (en banc) (plurality opinion) ("It is not enough that a Member's conduct is within the outer perimeter of the legislative process."). The Clause protects only acts that are "an integral part of the deliberative and communicative processes by which Members participate in committee and House proceedings with respect to the consideration and passage or rejection of proposed legislation or with respect to other matters which the Constitution places within the jurisdiction of either House." *Gravel*, 408 U.S. at 625.

Supreme Court precedent offers examples of acts that are and are not legislative. Acts that are legislative include making speeches on the House or Senate floor, *Johnson*, 383 U.S. at 184–85; introducing and voting on legislation, *Kilbourn*, 103 U.S. at 203–04; *Helstoski I*, 442 U.S. at

489; *Coffin*, 4 Mass. (4 Tyng) at 27; holding committee hearings, *Gravel*, 408 U.S. at 624; creating committee reports on legislation, *Doe v. McMillan*, 412 U.S. 306, 313 (1973); *Coffin*, 4 Mass. (4 Tyng) at 27; and conducting investigations by interrogating witnesses, *Tenney*, 341 U.S. at 378, and subpoenaing records, *Eastland*, 421 U.S. at 504–05. By contrast, the Clause does not protect a legislator's providing constituent services, such as making appointments with agencies or assisting in procuring government contracts, *Brewster*, 408 U.S. at 512; or disseminating information outside Congress, *McMillan*, 412 U.S. at 314–16. The last category includes making speeches outside Congress, *Brewster*, 408 U.S. at 512; circulating press releases or newsletters, *Hutchinson*, 443 U.S. at 130–33, and republishing materials that are in the Congressional Record, *Gravel*, 408 U.S. at 625–26.

Other conduct—described as "ambiguously legislative" action—requires closer investigation. *United States v. Menendez*, 831 F.3d 155, 166 (3d Cir. 2016). For example, the Supreme Court has repeatedly held that the Speech or Debate Clause does not protect legislators' efforts to influence the president or his or her subordinates. *See, e.g.*, *Johnson*, 383 U.S. at 172; *Gravel*, 408 U.S. at 625; *Brewster*, 408 U.S. at 512; *McMillan*, 412 U.S. at 313; *Hutchinson*, 443 U.S. at 121 n.10. But lower courts have observed that whether the Clause protects congressional oversight of the executive branch "is less clear." *United States v. McDade*, 28 F.3d 283, 300 (3d Cir. 1994) (Alito, J.). The president exercises legislative responsibilities by signing or vetoing acts of Congress. *Edwards v. United States*, 286 U.S. 482, 490–91 (1932) (first citing *Smiley v. Holm*, 285 U.S. 355, 373 (1932); and then citing *La Abra Silver Mining Co. v. United States*, 175 U.S. 423, 454 (1899)); *accord Buckley v. Valeo*, 424 U.S. 1, 121 (1976); *INS v. Chadha*, 462 U.S. 919, 947 (1983). If a member of Congress is negotiating potential laws with the president, that could fall within the "outer perimeter," *Trump*, 603 U.S. at 618 (quoting *Blassingame v. Trump*, 87 F.4th

1, 13 (D.C. Cir. 2023)), of "the deliberative and communicative processes by which Members" consider "proposed legislation," *Gravel*, 408 U.S. at 625. Similarly, the Clause might protect "letters or other informal communications to executive branch officials from committee chairmen, ranking committee members, or other committee members." *McDade*, 28 F.3d at 300 (collecting cases). These letters could be a routine way for members of the legislative branch to request facts about the subject matter of legislation they are considering. The cases involving the Clause are often nuanced, and courts use a holistic, functional analysis to resolve them. *See In re Sealed Case*, 80 F.4th 355, 364 (D.C. Cir. 2023).

To determine whether conduct alleged in an indictment is legislative or non-legislative in character, courts consider the "exten[t]" to which the conduct departs from "pure speech or debate in either House," *Gravel*, 408 U.S. at 625; whether the conduct is "generally done in the course of the process of enacting legislation," *Hutchinson*, 443 U.S. at 131 (citing *Kilbourn*, 103 U.S. at 204); whether the conduct is "necessary to prevent indirect impairment of [legislative] deliberations," *Gravel*, 408 U.S. at 625 (citation omitted); the Clause's goals of preserving democratic self-governance and ensuring an independent legislature, *see Johnson*, 383 U.S. at 180; *Brewster*, 408 U.S. at 524–25; *Eastland*, 421 U.S. at 510–11; and the historical scope of the speech-or-debate privilege, *see Kilbourn*, 103 U.S. at 200–05; *Gravel*, 408 U.S. at 622–24, 623 n.14; *Brewster*, 408 U.S. at 507–09, 516–18; *Eastland*, 421 U.S. at 510; *Helstoski I*, 442 U.S. at 491.

This history and caselaw provide the framework to analyze Cuellar's motion. Cuellar argues that the court must dismiss the indictment against him for two reasons. First, Cuellar argues that evidence of his legislative acts is essential to the facial validity of the indictment and the elements the government must prove at trial. (*See* Docket Entry No. 87 at 11–16; Docket Entry No. 115 at 10–12). Second, Cuellar argues that the government procured the indictment through

a grand-jury presentation that impermissibly relied on evidence of his legislative acts.  (Docket Entry No. 115 at 13–14; *see also* Docket Entry No. 105).  Neither argument warrants dismissal.

### A.    The Indictment

For two reasons, the court rejects Cuellar's argument that the indictment is facially invalid. First, the government can make out a prima facie case of each element of the offense charged in the indictment without relying on the conduct that Cuellar argues is impermissible.  Second, only five out of the sixteen allegations that Cuellar challenges include legislative acts that would violate the Speech or Debate Clause if the government attempts to prove them at trial.  These allegations are an insubstantial part of the government's case.

### 1.    The Facial Validity of the Indictment

The Speech or Debate Clause requires dismissal of an indictment if it "draw[s] in[to] question the legislative acts of the defendant member of Congress or his motives for performing them." *Johnson*, 383 U.S. at 185.  A legislator indicted in a criminal case may prevail on a speech-or-debate challenge to the prosecution only if the government must "inquire into how" the defendant "spoke, how he debated, how he voted, or anything he did in the chamber or in committee in order to make out a violation of" the charged "statute[s]." *Brewster*, 408 U.S. at 526.

An indictment may be facially valid even if it alleges legislative acts.  For example, in *Brewster*, the Court held that the indictment was facially valid because the government could "make a prima facie case" of bribery without introducing at trial evidence that the legislator acted on the allegedly corrupt promise; the corrupt promise was the violation of the statute.  *Id.*  In dissent, Justice White argued that the Court should have dismissed the indictment because the government "intended to prove facts that questioned and impugned the motives and purposes underlying specified legislative acts." *Id.* at 554 (White, J., dissenting).  The majority held to the

10

prima-facie-case principle over the dissent's objection.  The majority explained that because legislative-act evidence "is inadmissible," the references to legislative acts in the indictment did not create a risk that "a Member [of Congress] may be convicted" because of his or her protected conduct.  *Id.* at 528.

Cuellar's motion resists this standard, arguing that the allegations of legislative acts in the indictment warrant dismissal.  (Docket Entry No. 87 at 6–11).  Cuellar lacks support for this position.  He points to the comments in *Johnson* that the government's reliance on a speech that the defendant gave in the House of Representatives "infected" the prosecution and "necessarily contravene[d] the Speech or Debate Clause."  383 U.S. at 171, 184–85.  But *Johnson* was "limited to prosecutions involving [its novel] circumstances"; the government at trial presented a case so substantially reliant on legislative-act evidence that the jury likely convicted the congressman because of his legislative acts.  *Id.* at 184–85, 184 n.14.  The Court focused on the government's trial evidence, not the grand jury's indictment.

The disposition of *Johnson* also forecloses Cuellar's argument.  The Court remanded the case for retrial because the "making of the speech . . . was only a part of the conspiracy charge."  *Id.* at 185.  The Court's ruling "eliminated" the "references" to the defendant's legislative acts, so the government was not "precluded from a new trial . . . wholly purged of elements offensive to the Speech or Debate Clause."  *Id.*  *Johnson* undermines Cuellar's expansive position.  The *Brewster* Court relied on *Johnson* to hold that an indictment is facially valid as long as the government can make a prima facie case of a statutory violation without legislative-act evidence.  *See Brewster*, 408 U.S. at 528 ("To accept the arguments of [Justice White's] dissent would be to retreat from the Court's position in *Johnson* . . . .").

The courts of appeals have adhered to the standard *Brewster* set, recognizing that an indictment is valid even if it includes some allegations of conduct that the Speech or Debate Clause protects. *See, e.g.*, *Renzi*, 651 F.3d at 1027; *Fields*, 459 F.3d at 13–14; *McDade*, 28 F.3d at 296; *United States v. Murphy*, 642 F.2d 699, 700 (2d Cir. 1980) (per curiam); *United States v. Dowdy*, 479 F.2d 213, 224 (4th Cir. 1973). As the Eleventh Circuit explained in dismissing counts in an indictment against a former member of the House of Representatives, "the improper Speech or Debate evidence . . . was fatal to the indictment . . . not because the improper references were so widespread" but "because evidence of [the Congressperson's] legislative acts was an essential element of proof with respect to the affected counts." *United States v. Swindall*, 971 F.2d 1531, 1549 (11th Cir. 1992). For indictments that mention, but do not necessarily rely, on allegations of legislative acts as elements of the offense, the proper remedies are striking those allegations and excluding testimony or evidence proffered as proof of those allegations, or providing limiting instructions, not dismissal.

The Supreme Court has recently reaffirmed the *Brewster* standard for the validity of an indictment that alleges some immunized conduct. In *Trump*, the government indicted the then-former president for conspiring to overturn the November 2020 election by knowingly spreading false claims of election fraud to obstruct the finalization of the election's results. 603 U.S. at 602. The Supreme Court held that President Trump could assert immunity for his official acts. *Id.* at 608, 630. But the Court did not dismiss the indictment, even though it included allegations of protected, official acts. *See id.* The Court instead remanded the case to the district court with instructions to "ensure that sufficient allegations support the indictment's charges without such conduct." *Id.* at 630. Although there are important differences between the Speech or Debate Clause and presidential immunities, *see Fields*, 459 F.3d at 12–13, 13 n.21, the Court again applied

*Brewster*'s prima-facie standard to determine whether the prosecution could survive an assertion of immunity.

For two reasons, the indictment against Cuellar survives under *Brewster*. First, Cuellar does not present an argument under the *Brewster* standard. He presents the conclusory assertion that "this is not a case where the legislative acts involved are somehow not essential to the *prima facie* case against the Congressman" because "Paragraphs 45, 83, 86, 93, 95, 96, 97, 98, 100, 101, 102, 111, 115 and 120 are alleged as predicate acts." (Docket Entry No. 87 at 14). He repeats the same argument in his reply brief, with a blanket suggestion that the government made Cuellar's legislative acts "essential to its allegations" because they "tak[e] up ten pages in the indictment" and are "wove[n] . . . into seven substantive counts." (Docket Entry No. 115 at 12). This argument, however, repeats the erroneous legal assumption that an indictment's "widespread" discussion of legislative acts means that those legislative acts are "an essential element of proof with respect to the affected counts." *Swindall*, 971 F.2d at 1549. Without a concrete explanation for why, after excising all the challenged allegations, there are "[in]sufficient allegations [to] support the indictment's charges," *Trump*, 603 U.S. at 630; *Brewster*, 408 U.S. at 526, Cuellar cannot carry his burden of establishing immunity, *see Menendez*, 831 F.3d at 165; *Gov't of V.I. v. Lee*, 775 F.2d 514, 524 (3d Cir. 1985); *United States v. Rostenkowski*, 59 F.3d 1291, 1300 (D.C. Cir.), *supplemented on denial of reh'g*, 68 F.3d 489 (D.C. Cir. 1995).

Second, a review of the indictment demonstrates that the government can prove a prima facie case on each of the alleged charges without the challenged allegations. Each count builds on the bribery allegations against Cuellar, and the Supreme Court has held that the government can allege bribery offenses without violating the Speech or Debate Clause.

Proof of bribery requires evidence that "a public official . . . directly or indirectly . . . demand[ed], [sought], receive[d], accept[ed], or agree[d] to receive or accept anything of value . . . in return for," among other potential violations, "being influenced in the performance of any official act." 18 U.S.C. § 201(b)(2)(A). Count 2 alleges that Cuellar accepted hundreds of thousands of dollars from an Azerbaijani oil company in return for promises to perform certain official acts, (Docket Entry No. 1 ¶ 97), and Count 6 alleges the same with respect to a Mexican bank, (*id.* ¶ 115). The government can prove these counts under the applicable precedent by introducing evidence of Cuellar's promises to perform legislative acts. *Brewster*, 408 U.S. at 526; *see Helstoski I*, 442 U.S. at 490 ("A promise to deliver a speech, to vote, or to solicit other votes at some future date is not 'speech or debate.'").

The government may also rely on official, but not legislative, acts that the indictment alleges Cuellar performed in exchange for payment. For instance, the indictment alleges that Cuellar pressured executive-branch officials to act on Azerbaijan's conflict with Armenia, on the Azerbaijani ambassador's daughter's passport application, and on federal regulations of interest to the Mexican bank. (*See* Docket Entry No. 1 ¶¶ 45(f), 45(i), 83(a), 83(e)). Cuellar does not object to these allegations in his motion. Nor could he, because the Supreme Court has expressly held that they are outside the Speech or Debate Clause's scope. *See Gravel*, 408 U.S. at 625 (holding that the Clause does not protect "cajol[ing] . . . and exhort[ing]" executive officials "with respect to the administration of a federal statute"); *Brewster*, 408 U.S. at 512 (holding that the Clause does not protect errands performed for constituents or "the making of appointments with Government agencies"); *Hutchinson*, 443 U.S. at 121 n.10 ("[I]t does not protect attempts to influence the conduct of executive agencies.").

The government may seek to prove the bribery counts through circumstantial evidence. The indictment alleges that Cuellar and his wife met and communicated repeatedly with foreign agents and received money funneled to his wife through shell companies from those agents and the entities they represented, but performed little or no legitimate work in return for those payments. (Docket Entry No. 1 ¶¶ 21–44, 46–82). A jury could infer from this arrangement that Cuellar promised to perform official acts and accepted substantial payments in return. *See United States v. Massey*, 89 F.3d 1433, 1439 (11th Cir. 1996) (explaining that the government does not need to "produce direct evidence of a verbal or written agreement in order for this court to sustain the bribery conviction"); *United States v. Carpenter*, 961 F.2d 824, 827 (9th Cir. 1992) (emphasizing that requiring direct evidence of a bribe or agreement "would allow officials to escape liability . . . with winks and nods, even when the evidence as a whole proves that there has been a meeting of the minds to exchange official action for money"). None of these routes to conviction violate the Speech or Debate Clause.

The counts charging honest-services wire fraud conspiracy, in violation of 18 U.S.C. § 1349 (Counts 3 and 7), depend on similar proof. These charges require evidence of "fraudulent schemes to deprive another of honest services through bribes or kickbacks supplied by a third party who had not been deceived." *Percoco v. United States*, 598 U.S. 319, 328 (2023) (quoting *Skilling v. United States*, 561 U.S. 358, 404 (2010)). Section 1349 relies on § 201(b), the traditional bribery statute, to supply its content. *See United States v. Nagin*, 810 F.3d 348, 351 (5th Cir. 2016) ("To define the scope of the honest-services statute's proscription . . . courts to look to . . . the principal federal bribery statute."). As a result, the theories of liability that can sustain the indictment's bribery counts can also sustain its honest-services fraud counts. Section 1349 introduces no new elements that would require the government to present legislative-act evidence.

The indictment allegations that Cuellar engaged in a conspiracy (Counts 1 and 5) also derive from the bribery charges. "A conspiracy is a partnership in crime," *Pinkerton v. United States*, 328 U.S. 640, 644 (1946), and requires "agreement of two persons" to commit an unlawful act, *id.* at 643. "The agreement to do an unlawful act is" a crime itself and is "distinct from the doing of the act." *Id.* at 644. If the government proves the agreement and a single overt act in furtherance of that agreement, then a jury may convict each member of the conspiracy; the conspiracy does not need to accomplish its goals. *United States v. Veltre*, 591 F.2d 347, 350 (5th Cir. 1979); *see also McDade*, 28 F.3d at 300. The indictment alleges that Cuellar and his wife engaged in a conspiracy to accept bribes. (Docket Entry No. 1 ¶ 87(a)). It further alleges many overt acts taken in furtherance of the conspiracy that are unrelated to Cuellar's legislative activities, including accepting through shell companies a series of wire and check payments into a Laredo bank account. (*Id.* ¶ 95(a)–(e)). These allegations are sufficient to sustain a prima facie case of conspiracy to commit bribery; "acceptance of the money . . . is an act taken in furtherance of the distribution of the proceeds of an unlawful bribery scheme." *United States v. Arruda*, 715 F.2d 671, 682 (1st Cir. 1983); *see United States v. Ngari*, 559 F. App'x 259, 272 (5th Cir. 2014) (per curiam) ("[A]cceptance and retention of fraud proceeds is an overt act in furtherance of a conspiracy." (citing *United States v. Loe*, 248 F.3d 449, 456–57 (5th Cir. 2001))).

For the same reasons, the money-laundering counts do not violate the Speech or Debate Clause; they are derivative of the other counts in the indictment. Count 9 charges Cuellar with engaging in a money-laundering conspiracy, in violation of 18 U.S.C. § 1956(h), and Counts 10 through 14 charge Cuellar with the substantive money-laundering offense, in violation of 18 U.S.C. § 1956(a)(1)(B)(i), (a)(2). To prove money laundering, the government must prove that the defendant: (1) conducted a financial transaction; (2) which he knew involved proceeds from

unlawful activity; (3) with either (a) the intent to promote or further the unlawful activity or (b) knowledge that the transaction sought to conceal or disguise the nature or source of the illegal proceeds. *United States v. Valdez*, 726 F.3d 684, 689 (5th Cir. 2013). Conducting financial transactions is unrelated to Speech or Debate in Congress, *cf. Brewster*, 408 U.S. at 526, and the indictment alleges bribery and honest-services wire fraud as the unlawful activity underlying the money-laundering charge, (Docket Entry No. 1 ¶¶ 122, 125). Counts 10 through 14 do not require the government to introduce additional legislative-act evidence. Nor does Count 9, the related conspiracy charge, because it only requires proof of an agreement and an overt act, *Pinkerton*, 328 U.S. at 643–64; *United States v. Bueno*, 585 F.3d 847, 850 (5th Cir. 2009), such as the alleged financial transactions, (Docket Entry No. 1 ¶¶ 42, 85, 125).

The court rejects Cuellar's facial challenge to the indictment. His argument does not apply the governing legal standard, and it does not appear that he could satisfy that standard. The government can prove each of its counts without relying on evidence of legislative acts.

### 2. Cuellar's List of Legislative-Act Allegations

Although it is unnecessary to parse Cuellar's list of allegations that he believes violates the Speech or Debate Clause in order to deny his motion, the court does so for two reasons. First, Cuellar plans to file an interlocutory appeal, and a complete analysis of the parties' arguments may both aid and expedite appellate review. Second, the court must rule on Cuellar's objections before trial because the Speech or Debate Clause affords legislators both an immunity from suit and the benefit of an exclusionary rule. *Eastland*, 421 U.S. at 503; *Gravel*, 408 U.S. at 615–16, 621–22; *Helstoski I*, 442 U.S. at 487.

After reviewing the parties' careful attention to Cuellar's list of challenged allegations and considering their positions at oral argument, the court concludes that five out of the sixteen

allegations that Cuellar challenges include legislative-act evidence that will violate the Speech or Debate Clause if the government attempts to introduce them at trial. The allegations that Cuellar challenges fall into roughly two sets: (1) communications between Cuellar and his alleged bribe payors confirming that he took certain legislative acts; and (2) communications between Cuellar and his alleged bribe payors discussing potential legislative acts that Cuellar could or would take. The first set of allegations pose constitutional problems, but the second set does not.

### i.    Communications Referring to Past Legislative Acts

The indictment alleges that Cuellar reported to his alleged bribe payors that he undertook certain legislative acts. The relevant allegations are listed below[2]:

1. ¶ 45(a) alleges that Cuellar reported to Azerbaijani Diplomat-1, to Individual-1, a Turkish-American businessman alleged to have helped broker the bribe payments, and to an associate of Individual-1 that he placed language in a bill;

7. ¶ 45(g) alleges that Cuellar sent Azerbaijani Diplomat-1 a message that he "[s]ubmitted language" and that Azerbaijani Diplomat-1 approved of Cuellar's actions;

12. ¶ 45(m) alleges that Cuellar texted Azerbaijani Diplomat-1 a tweet about an amendment that Cuellar withdrew from consideration;

13. ¶ 83(b) alleges that Cuellar sent Executive-1, the Vice Chairman of the Mexican bank that allegedly paid Cuellar bribes, an updated version of a committee report after promising to include in the new draft Executive-1's previous revisions; and

14. ¶ 83(c) alleges that Cuellar reported to Executive-1 that he was attempting to and ultimately did add language favorable to the Mexican bank into legislation in committee.

Cuellar argues that the government cannot introduce these communications into evidence because they show his performance of legislative acts. This argument finds firm support in Supreme Court precedent. The Court has confirmed that even *references* to past legislative acts of a Member cannot be admitted without undermining the values protected by the Clause."

---

[2] The court numbers these allegations consistent with Cuellar's list of challenged allegations, as recounted in Part I.

*Helstoski I*, 422 U.S. at 489 (emphasis added).  The "concern is whether there is *mention* of a legislative act," *id.* at 490 (emphasis added), because "[r]evealing information as to a legislative act . . . to a jury would subject a Member to being 'questioned' in a place other than the House or Senate, thereby violating the explicit prohibition of the Speech or Debate Clause."  *Id.*

The government does not dispute that these allegations include references to legislative acts.  The government instead argues that: (1) the Clause does not protect newsletters or press releases, so it does not protect post-legislative-act communications; and (2) the Clause does not prevent the government from introducing Cuellar's communications to show that "a member was thought to have performed a legislative act in the past and was paid in exchange for or because of it," *McDade*, 28 F.3d at 293.  (Docket Entry No. 103 at 19–20).  These arguments do not persuade the court to depart from the holding in *Helstoski I*.

The government's first argument fails because the precedent on which it relies is distinguishable.  The Supreme Court's decisions that permitted evidence of legislators' press releases, newsletters, or other acts of republication did not address communications that included references to the defendant's legislative acts.  In *Gravel*, the Court permitted the prosecution of "Senator Gravel's alleged arrangement with Beacon Press to publish the Pentagon Papers."  408 U.S. at 622.  In *McMillan*, the plaintiffs asserted libel claims for the dissemination of reports that contained 45 pages of "copies of absence sheets, lists of absentees, copies of test papers, and documents relating to disciplinary problems of certain specifically named students."  412 U.S. at 308.  And in *Hutchinson*, Senator Proxmire included in his extra-congressional speeches, newsletters, and press releases his thoughts that Hutchinson's research on aggression, as observed through behavioral patterns in certain animals, was a waste of taxpayer money.  443 U.S. at 114–117.  In none of these cases did the Supreme Court hold that evidence of a defendant's legislative

act was admissible simply because an otherwise admissible press release, newsletter, or extra-congressional communication discussed the legislative act.

Traditional evidence principles also weigh against the government's first argument. Paragraphs 45(a), (g), and (m), as well as Paragraphs 83(b) and (c), present a sort of double-hearsay problem. Compare the current posture to one in which a litigant wants to introduce out-of-court statements recorded in a document for the truth of the matter asserted in the statements. Both the document and the statements within the document are hearsay, and the litigant seeking to admit the underlying statements must establish either exceptions or exclusions for both layers of hearsay. *See* FED. R. EVID. 805. Here, the government runs into a double speech-or-debate problem. Even if the holdings in *Gravel*, *McMillan*, and *Hutchinson* enable the government to introduce evidence that Cuellar made the alleged post-legislative-act communications, those cases do not establish that the entire content of the communications is unprotected. The court cannot admit into evidence the embedded legislative-act evidence, even though parts of the press release, newsletter, email, or text message may be otherwise admissible.

The government's second argument is stronger, but it is still not enough. The government relies on then-Judge Alito's opinion in *McDade*, which held that the Speech or Debate Clause did not prevent the government from discussing, for limited purposes, McDade's "legislative or committee status." 28 F.3d at 294. The Third Circuit reasoned that reliance on McDade's committee status was permissible because the government used it to prove two facts that were "closely related" to legislative acts but were "nevertheless distinct": "that a member promised to perform a legislative act in the future or even that a member was thought to have performed a legislative act in the past and was paid in exchange for or because of it." *Id.* at 293. Then-Judge Alito contrasted the government's prosecution in *McDade* to the one the Eleventh Circuit found

problematic in *Swindall*.  In *Swindall*, the government used the defendant's committee status "to show that he actually performed . . . legislative acts"; in *McDade*, the government used the defendant's committee status "to show that he was thought by those offering him bribes and illegal gratuities to have performed such acts and to have the capacity to perform other similar acts."  *Id.*  The "Speech or Debate Clause d[id] not prohibit proof of the defendant's committee status for the [specific] purposes proffered by the prosecution."  *Id.* at 294.

The government relies on *McDade* to argue that "informing a bribe payor about legislative acts taken pursuant to a corrupt bargain is distinct from the legislative acts themselves" and that "[c]ommunicating information in that manner and under those circumstances is in no way essential to the legislative process."  (Docket Entry No. 103 at 20).  Paragraphs 45(a), (g), and (m), as well as Paragraphs 83(b) and (c), allege that Cuellar told others that he performed a legislative act, not that he in fact performed the legislative act raised in his communications.  *See Helstoski I*, 442 U.S. at 496 (Stevens, J., concurring in part and dissenting in part).  The relevant fact, in the government's view, is that Cuellar's alleged bribe payors thought he performed a legislative act, not that Cuellar actually performed the act described in his communications.

This argument is facially appealing but inconsistent with *Helstoski I* and the majority's response to Justice Stevens's partial dissent.  In *Helstoski I*, the government argued that it could introduce into evidence "discussions and correspondence which describe and refer to legislative acts" because "the discussions and correspondence did not occur during the legislative process." 442 U.S. at 486.  The Court rejected the government's argument, holding that the Speech or Debate Clause excludes mere "references to past legislative acts," *id.* at 488, and "mention[s]" of them, *id.* at 490.  The Court relied on the explanation in *Brewster* that the government must make out its prima facie case without evidence of "any act of [Brewster] *subsequent* to the corrupt promise for

payment." *Id.* at 489 (alteration and emphasis in original) (quoting *Brewster*, 408 U.S. at 526). Because the proffered discussions and correspondence referred to legislative acts that occurred after the corrupt promise for payment, the Court concluded that the government's proffered evidence was inadmissible. *See id.*

Justice Stevens would have held instead that the post-legislative-act communications were admissible to establish Helstoski's intent in accepting payment. Justice Stevens argued in his partial dissent that the Court's holding was illogical because it would allow legislators to immunize themselves from prosecution by inserting references to past legislative acts in all communications. *See id.* at 494–96 (Stevens, J., concurring in part and dissenting in part). The majority rejected both arguments. It first explained that a purpose-based approach to admitting legislative-act evidence found no support in the Constitution's text. The Clause "does not refer to the prosecutor's purpose in offering evidence," and the disclosure of even references to the defendant's legislative acts "to a jury would [still] subject a Member to being 'questioned' in a place other than the House or Senate." *Id.* at 489–90. The Court then rejected Justice Stevens's contention that legislators could rely on its ruling to guarantee immunity. Courts could "excis[e] references to legislative acts, so that the remainder of the evidence would be admissible," just as they do with "the admission of [other] documentary evidence" that contains some privileged information. *Id.* at 488 n.7. Only "utterances within the scope of legislative acts" are protected, consistent with "the clear purpose of the Clause." *Id.*

These principles foreclose the government's reliance on the complete content of the communications alleged in Paragraphs 45(a), (g), and (m) and Paragraphs 83(b) and (c). *McDade* is not to the contrary because it addressed the admission of a legislator's committee assignment. An assignment is a legislative status, not a legislative act. *See McDade*, 28 F.2d at 290–91

(explaining that *Brewster* and *Helstoski I* permitted bribery prosecutions that depended in part on the "defendant's status as a member of Congress" and that the admissibility of a member's committee position "follow[ed]" from those holdings).  In recognizing this distinction, the Third Circuit acknowledged that "proof of past legislative acts would not be permitted."  *Id.* at 290 n.9.

In short, the government may redact "references to legislative acts" from Paragraphs 45(a), (g), and (m) and Paragraphs 83(b) and (c), "so that the remainder of the evidence would be admissible."  *Helstoski I*, 442 U.S. at n.7; *see Lee*, 775 F.2d at 523 ("[W]here a conversation includes a discussion of both legislative acts and non-legislative acts, the conversation can be examined and the immunized aspects of the conversation deleted.").  But it may not use the alleged communications wholesale.[3]

---

[3] This conclusion may be inconsistent with the Supreme Court's recent opinion in *Trump*.  Justice Barrett declined to join Part III-C of the Court's opinion because she thought the majority's reasoning would cause courts to exclude "any mention" of an official act associated with a bribe that a president accepted and that such an evidentiary rule "would hamstring the prosecution."  603 U.S. at 656 (Barrett, J., concurring in part).  Chief Justice Roberts responded in footnote three, stating that a prosecutor could "of course . . . point to the public record to show the fact that the President performed the official act."  *Id.* at 632 n.3 (majority opinion).  If this rule controls, then the government could admit into evidence the communications in Paragraphs 45(a), (g), and (m) and Paragraphs 83(b) and (c) of the indictment.  But *Trump* does not control, for two reasons.  First, the speech-or-debate and presidential-immunity exclusionary rules are distinguishable.  Notably, the presidential-immunity exclusionary rule is broader—applying to all official acts—and, in some circumstances, rebuttable.  *Trump*, 603 U.S. at 614–15, 623.  By contrast, the speech-or-debate exclusionary rule is narrower—applying only to legislative acts—but "absolute."  *Eastland*, 421 U.S. at 501.  Excluding all evidence of legislative acts is consistent with the text of the Clause and its absolute exclusionary rule.  Second, *Helstoski I* applies directly to this dispute.  Although every Supreme Court holding, even preliminary ones, controls this court's analysis, *see Trump v. Boyle*, 145 S. Ct. 2653, 2654 (2025) (per curiam); *Nat'l Insts. of Health v. Am. Pub. Health Ass'n*, No. 25A103, slip op. at 2–3 (U.S. Aug. 21, 2025) (Gorsuch, J., concurring in part and dissenting in part), this court must follow directly applicable precedent, even if it is in tension with more recent decisions, unless and until the Supreme Court overturns the directly applicable precedent, *see Rodriguez de Quijas v. Shearson/American Express, Inc.*, 490 U.S. 477, 484 (1989); *Mallory v. Norfolk S. Ry. Co.*, 600 U.S. 122, 136 (2023); *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 406 (2024).  Footnote three in *Trump* is not a basis to depart from *Helstoski I* in this case.

23

ii.    **Communications About Future Legislative Acts**

The remainder of Cuellar's list of contested allegations describes communications between Cuellar and his alleged bribe payors about potential legislative acts Cuellar could or would take.

Paragraph 45 alleges many communications among Cuellar, an Azerbaijani Diplomat, and an individual with links to the oil company that delivered payments to Cuellar:

2.  ¶ 45(b) alleges communications among Cuellar, Azerbaijani Dipolomat-1, and Individual-1 discussing Cuellar's promise that he will "try to keep . . . out" a potential amendment to a bill and talking points that an Azerbaijani embassy employee would send to Cuellar about the potential amendment;

3.  ¶ 45(c) alleges that Cuellar sent Azerbaijani Diplomat-1 and Individual-1 a document summarizing funding measures in an appropriations bill and advising that they needed to "follow up for Azerbaijan";

4.   ¶ 45(d) alleges that Cuellar staffers solicited input on a committee report from employees at the Embassy of Azerbaijan, that the Embassy employees requested that Cuellar advocate for certain language in support of Azerbaijan, and that Cuellar instructed Individual-1 to send to his staff proposed language to insert into the report;

6.  ¶ 45(e) alleges that Cuellar emailed Azerbaijani Diplomat-1 and Individual-1 the text of a speech that emphasized Azerbaijan's strategic importance to the United States and alleges that Cuellar intended to give the speech on the House floor;

8.  ¶ 45(h) alleges that Cuellar and Azerbaijani Diplomat-1 discussed an amendment to an appropriations bill that another Congress member introduced and that Cuellar would "work on it" and try to persuade the Congress member to withdraw the amendment;

9.  ¶ 45(j) alleges that Azerbaijani Diplomat-1 sent Cuellar a tweet from another Congress member, which encouraged a policy position contrary to Azerbaijan's interests, and that Cuellar responded that he and Azerbaijani Diplomat-1 needed to lobby against the policy position;

10. ¶ 45(k) alleges that Cuellar texted Azerbaijani Diplomat-1 that he would add amendments and riders that would target Armenia, Azerbaijan's adversary in a dispute over the Nagorno-Karabakh region, to legislation; and

11. ¶ 45(l) alleges that Azerbaijani Diplomat-1 and Cuellar exchanged text messages about amendments that Cuellar could add to legislation and about Azerbaijani Diplomat-1's request to cause another Congress member to make a statement about violence in the Nagorno-Karabakh region in support of Azerbaijan.

Paragraph 83 alleges many communications among Cuellar, Executive-1, and others about legislative issues material to the Mexican bank that delivered payments to Cuellar:

13. ¶ 83(b) alleges that Cuellar emailed Executive-1 to request input on draft committee reports about de-risking in banking, that Executive-1 responded with a revised version of the report, and that Cuellar said he would submit the revised report to the committee;

14. ¶ 83(c) alleges in part that Cuellar informed Executive-1 that he was attempting to add language into bills;

15. ¶ 83(d) alleges that Cuellar communicated with Executive-1 through text messages and his staffers to solicit input about potentially co-sponsoring a bill that would prohibit the Consumer Financial Protection Bureau from regulating payday loans for two years and that a president of one of the Mexican bank's U.S. affiliates would prepare a memorandum on the bill; and

16. ¶ 83(f) alleges that Executive-2, a legislative-affairs executive at the Mexican corporate conglomerate that owned the Mexican bank, communicated repeatedly about pending money-laundering legislation that Cuellar said he would "carry" in the House of Representatives.

The government argues that evidence of each of these communications is admissible because they describe promises to perform legislative acts in the future. (Docket Entry No. 103 at 17–24). Cuellar responds that the government contorts the term "promise" to fit within *Brewster* and that these allegations instead describe the careful and painstaking work of crafting legislation in Congress. (Docket Entry No. 115 at 5–12). The problem with Cuellar's argument is that he treats the categories of informal factfinding, deliberation about future legislative acts, and preparation for future legislative acts "as always privileged." *In re Sealed Case*, 80 F.4th at 370. The Supreme Court and most of the courts of appeals to confront the question have disagreed.

Supreme Court precedent holds that a promise to perform a legislative act is not a legislative act. The Clause's text and purpose lead to this result. The "language of the Clause," which uses the past tense of "questioned," limits its protection "only to an act that has already been performed." *Helstoski I*, 442 U.S. at 489–90 (emphasis omitted). The text does not cover a

25

promise to perform a future legislative act, which is made before that act occurs.  *See id.* at 490 (explaining that the Clause forbids the admission of communications about actions "subsequent" to the corrupt promise (emphasis omitted) (quoting *Brewster*, 408 U.S. at 526)).  Extending the scope of the Clause in a way that would in effect sanction bribery and would strengthen neither the democratic process nor legislative independence.  "[F]inancial abuses by way of bribes . . . gravely undermine legislative integrity and defeat the right of the public to honest representation." *Brewster*, 408 U.S. at 524–25.  And "[d]epriving the Executive of the power to investigate and prosecute and the Judiciary of the power to punish bribery of Members of Congress is unlikely to enhance legislative independence."  *Id.*  As a result, the Supreme Court has held that "[t]aking a bribe is, obviously, no part of the legislative process or function . . . ."  *Id.* at 526.

Bribery is not an exception to an otherwise capacious definition of "Speech or Debate." The Supreme Court has not protected legislators' pre-legislative-act communications with third parties outside Congress.  The Court has instead repeatedly held that the Speech or Debate Clause "does not privilege" legislators or their aides "to violate an otherwise valid criminal law in preparing for or implementing legislative acts."  *Gravel*, 408 U.S. at 626.

In *Gravel*, a senator obtained a copy of the Pentagon Papers with the help of his aide.  *Id.* at 608–10.  Senator Gravel read the papers into the Congressional Record, and the Supreme Court held that the Speech or Debate Clause protected the Senator's speech.  *Id.* at 615–16, 622.  But the Court permitted inquiry into how the Senator and his aide obtained the Pentagon Papers.  A grand jury could ask the Senator's aide questions "to trac[e] the source of" the "documents that came into the Senator's possession," *id.* at 628, because the Clause did not enable illicit conduct "in preparing for or implementing legislative acts," *id.* at 626.  The holding that "the acquisition of documents—a form of informal factfinding—was not a legislative act . . . pokes a substantial hole

in" Cuellar's claim that the Clause absolutely protects his investigation into, other preparations for, and his communications with third parties about future legislative acts. *In re Sealed Case*, 80 F.4th at 370; *accord McSurely v. McClellan*, 553 F.2d 1277, 1287–88 (D.C. Cir. 1976) (en banc).

*Hutchinson* further undermines Cuellar's argument.  In that case, Senator Proxmire collected information about allegedly wasteful spending and circulated press releases and constituent newsletters documenting the findings.  443 U.S. at 114–17.  The Court recognized that public statements by members of Congress "exert some influence on other votes in the Congress and therefore have a relationship to the legislative and deliberative process." *Id.* at 131.  But the Court concluded that Hutchinson's communications were not "essential" to congressional deliberations.  *Id.* at 130.  The informing function of members of Congress, as Woodrow Wilson defined the concept, "did not include wide-ranging inquiries by individual Members on subjects of their choice" because there is "a distinction between the *informing* function and the *legislative* function." *Id.* at 132 (emphasis in original).  Under *Hutchinson*, "[n]ot all communications that may influence a vote"—here, even Cuellar's own vote—"are privileged." *In re Sealed Case*, 80 F.4th at 370.

*Gravel* and *Hutchinson* illustrate the Supreme Court's refusal to extend the Speech or Debate Clause to "all things in any way related to the legislative process." *Brewster*, 408 U.S. at 512; *see Gravel*, 408 U.S. at 625; *Fields*, 459 F.3d at 12–13.  Although the Court has not yet resolved the question, pre-legislative-act communications with private parties outside Congress appear to be beyond the Clause's scope.  Whether the Speech or Debate Clause protects certain conduct cannot turn on the fact that Congress criminalized the conduct because it "was designed to preclude prosecution of Members for legislative acts." *Helstoski I*, 442 U.S. at 488.  *But see Johnson*, 383 U.S. at 185 (leaving open the question whether a prosecution that entails "inquiry

into legislative acts or motivations" can proceed under "a narrowly drawn statute passed by Congress in the exercise of its legislative power to regulate the conduct of its members"). As a result, the *Gravel* Court could not have permitted inquiry into conduct undertaken "in prepar[ation] for" a senator's "legislative acts" simply because those steps violated "an otherwise valid criminal law." 408 U.S. at 626. Nor could the *Hutchinson* Court have revived a civil suit against a senator simply because a reasonable jury could have concluded that the senator defamed the plaintiff. *See* 443 U.S. at 122–23, 136. The Court could have permitted the prosecutions of both suits only if the Clause did not protect the type of conduct the legislators performed. *See Gravel*, 408 U.S. at 620 (explaining that "immunity was unavailable [to defendants in past cases] because they engaged in illegal conduct that was not entitled to Speech or Debate Clause protection"); *Renzi*, 651 F.3d at 1025 (same). Both cases, like Cuellar's, involved pre-legislative-act communications with third parties about a "subject . . . which may be expected to come before the" legislature. *Coffin*, 4 Mass. (4 Tyng) at 30.

"Taken together, the decisions establish that a congressman is immune from questioning about his speeches, debates and votes, but that he is accountable to the executive and judicial branches for his conduct in preparing his speeches" and in "deciding how to vote." Robert J. Reinstein & Harvey A. Silverglate, *Legislative Privilege and the Separation of Powers*, 86 HARV. L. REV. 1113, 1163 (1973).

The scope of the Speech or Debate Clause's privilege at the Founding supports the conclusion that Cuellar's communications with third parties outside Congress about future legislative acts are not protected. *See Kilbourn*, 103 U.S. at 200–05 (considering the Speech or Debate Clause's history and common-law background); *Gravel*, 408 U.S. at 622–24, 623 n.14 (same); *Brewster*, 408 U.S. at 507–09, 516–17 (same); *Helstoski I*, 442 U.S. at 491–93 (same);

*Hutchinson*, 443 U.S. at 125–30. Joseph Story understood the privilege to be "strictly confined to things done in the course of parliamentary proceedings." STORY, *supra*, § 865, at 610–11 (citing JEFFERSON, *supra*, § 3, at 16).[4] *Coffin*, "the most authoritative case in this country on the construction of the provision in regard to freedom of debate in legislative bodies," *Kilbourn*, 103 U.S. at 204, similarly limited the privilege to communications exchanged "in the execution of [a legislator's] official duty," *Coffin*, 4 Mass. (4 Tyng) at 31.

In *Coffin*, the Supreme Judicial Court of Massachusetts reviewed an action for slander based on a conversation in the House of Representatives of the Massachusetts legislature. *Id.* at 23–24. Chief Justice Parsons surveyed the general principles of the State's speech-or-debate privilege, concluding that it exempted from prosecution "every thing said or done by . . . a representative[] in the exercise of the functions of that office." *Id.* at 27. To the Massachusetts high court, the official function was a critical limitation on the privilege, balancing the need for legislative privileges against private citizens' rights. *See id.* at 27–29. As a result, the legislator could the claim the privilege only when the alleged conduct occurred while the legislature was "in session." *Id.* at 28. The legislator also had to make the statement as an exercise of his powers or

---

[4] Even the more expansive readings of the Founding-era history, which the Supreme Court has not adopted, *see* Reinstein & Silverglate, *supra*, at 1136–63, do not aid Cuellar on the facts of his case. During the Adams administration, Thomas Jefferson and James Madison protested the prosecution of anti-Federalist Congressmen for sending to their constituents allegedly seditious newsletters that attacked President Adams's policy toward France. *See id.* at 1140–42. One of their objections included an expansive reading of the Speech or Debate Clause. Jefferson and Madison argued that the prosecutions violated the "law of this land . . . that [representatives'] communications with their constituents should of right, as of duty also, be free, full, and unawed by any." 8 WORKS OF THOMAS JEFFERSON 322 (Ford ed. 1904). To Jefferson and Madison, the speech-or-debate violation was the coordinate branches' imposition "between the constituent and his representative." *Id.* at 325. Here, the government imposes not on Cuellar's relationship with his constituents, but rather on his relationship with alleged foreign entities and agents to whom he does not owe the duties that a Congress member might owe his or her constituents. In addition, Jefferson retreated from this expansive view of the Clause when he described its privilege in his manual for the Senate, commenting that it "is restrained to things done in the House in a Parliamentary course" and does not attach "contra morem parliamentarium [against parliamentary custom]." JEFFERSON, *supra*, § 3, at 16. The historical record does not support Cuellar's argument.

duties.  Location alone was not enough because a legislator can claim the privilege only when "some language or conduct of his" is "in the character of a representative." *Id.* at 31.  Taken together, a legislator may claim the speech-or-debate privilege when the "body of which he is a member, is in session and he, as a member of that body, is in fact discharging the duties of his office." *Id.* at 28.

The legislator's slander did not fall within the rule in *Coffin*.  The legislator attempted to rebrand the alleged slander as an exercise of his official, legislative duties; he argued that "the privilege must extend to a representative giving information to a brother member" because "the information may be necessary to enable the member informed to discharge his official duty with ability and propriety." *Id.* at 30.  The court rejected the argument because no evidence supported it.  *See id.* at 29–30.  Chief Justice Parsons went on to acknowledge "the essential distinction between a man's seeking information on subjects relating to his office, and his actual execution of its functions." *Id.*; *accord Hutchinson*, 443 U.S. at 132.  For the legislator to have "spoken officially," *Coffin*, 4 Mass. (4 Tyng) at 33, "the words must [have] be[en] spoken on a subject before the house, and either addressed to the chair, or by one member to another by way of deliberation and advice on the same subject," *id.* at 32 (applying the House resolution that defined the "privileges secured to the members by" the state constitution's speech-or-debate provision); *accord In re Sealed Case*, 80 F.4th at 372 (protecting intra-congressional communications about pending votes).  *Coffin* does not "enlarg[e] 'legislative acts' to include illicit conduct outside the House," *Brewster*, 408 U.S. at 514, or "all conduct relating to the legislative process," *id.* at 515.

Other courts in the Antebellum and Reconstruction periods adopted similar limiting principles.  Another "leading case regarding legislative immunity," *Bogan v. Scott-Harris*, 523 U.S. 44, 50 n.4 (1998) (emphasis omitted), explained that legislative privilege attached to the

exercise of discretionary powers vested by law in an official, *see Wilson v. New York*, 1 Denio 595, 599–600 (N.Y. 1845) (permitting impeachment or indictment for corrupt actions). Legislators "vested with legislative powers" enjoyed immunity "in voting for a particular law." *Jones v. Loving*, 55 Miss. 109, 111 (1877); *accord Anne Arundel Cnty. Comm'rs v. Duckett*, 20 Md. 468, 477 (1864); *Baker v. State*, 27 Ind. 485, 488–89 (1867). They also enjoyed immunity for statements "in connection with . . . parliamentary debate" or "communications . . . to . . . legislative departments" if the communications were "before some individual or associated body of men . . . vested with authority . . . to entertain the proceeding." *Hosmer v. Loveland*, 19 Barb. 111, 115–16 (N.Y. 1854); *accord O'Donaghue v. McGovern*, 23 Wend. 26, 29 (N.Y. 1840); *accord Dunham v. Powers*, 42 Vt. 1, 8 (1869) (citing *Coffin*, 4 Mass. (4 Tyng) at 27); *see also McGaw v. Hamilton*, 184 Pa. 108, 113–15 (1898). Early American jurists tied legislative privilege to both power and place.

There are certainly arguments that the Speech or Debate Clause protects some informal factfinding and deliberation by legislators with third parties outside Congress. The power to legislate implies the power to investigate, to gather information, *Trump v. Mazars USA, LLP*, 591 U.S. 848, 862–63 (2020), and to prepare summaries of that information; those powers can assist the "deliberative and communicative processes by which" Congress members consider legislation, *Eastland*, 421 U.S. at 504 (quoting *Gravel*, 408 U.S at 625). The tasks of investigating and debating potential legislation are clearly important to legislating, even though legislators may accomplish these tasks behind the scenes, such as through meetings with constituents, business leaders, nonprofits, academics, or other parties with expertise and interest in the subject matter of potential or pending legislation. *See McSurely*, 553 F.2d at 1287 ("[A]cquisition of knowledge through informal sources is a necessary concomitant of legislative conduct . . . ."); *Lee*, 775 F.2d

at 521 (same); *Miller v. Transamerican Press, Inc.*, 709 F.2d 524, 530–31 (9th Cir. 1983) (same); *In re Sealed Case*, 80 F.4th at 369 (same); *see also La Union del Pueblo Entero v. Abbott*, 93 F.4th 310, 323 (5th Cir. 2024) (same, for state legislators); *Almonte v. City of Long Beach*, 478 F.3d 100, 107 (2d Cir. 2007) (same, for state legislators); *Bruce v. Riddle*, 631 F.2d 272, 279–80 (4th Cir. 1980) (same, for state legislators).[5]  Jurists have recognized that holding otherwise might isolate the legislators who most need the Clause's privilege: those who represent disfavored constituencies and lack the formal subpoena and investigatory powers that Congress invests in its majority parties via committees.  *See In re Sealed Case*, 80 F.4th at 374 (Katsas, J., concurring).

These considerations do not carry the day for Cuellar because "the proper test is whether a legislator's "communications are 'integral' or 'essential' to [legislative] deliberations."  *In re Sealed Case*, 80 F.4th at 370; *see Renzi*, 651 F.3d at 1023 (reading *Brewster* to focus on "whether the Congressman's *specific* conduct might fall within the Clause's protections").  Informal communications with individuals outside Congress may be important, but they are not "speech or debate in either House," which is the "heart of the Clause."  *Gravel*, 408 U.S. at 625.  Nor are all such communications "necessary to prevent indirect impairment" of essential or integral aspects of the legislative process.  *Id.* (citation omitted); *see, e.g.*, *id.* at 626–28; *Hutchinson*, 433 U.S. at 114–17, 130–31; *cf. In re Sealed Case*, 80 F.4th at 369–70.  *Gravel* and *Hutchinson*, and their

---

[5] The Fifth Circuit's determination that the state-legislator privilege, as defined by federal common law, covers "documents shared, and communications made, between the legislators and" private, third parties, such as constituents or interest groups, does not control the interpretation of the Speech or Debate Clause. *La Union del Pueblo Entero*, 93 F.4th at 323.  The state-legislator privilege is qualified by important federal interests, including the "enforcement of federal criminal statutes." *Id.* (quoting *United States v. Gillock*, 445 U.S. 360, 373 (1980)).  As a result, concluding that the state-legislator privilege facially covers those communications does not conflict with *Gravel*'s holding that the Speech or Debate Clause "does not privilege either Senator or aide to violate an otherwise valid criminal law," including the illegal sharing of classified documents, "in preparing for or implementing legislative acts."  408 U.S. at 626.  The Fifth Circuit has not weighed the distinct interests that the Speech or Debate Clause's absolute privilege raises. *See Brewster*, 408 U.S. at 516.  Nor has it considered whether communications with foreign agents about future legislative acts are "integral" or "essential" to the legislative process. *Gravel*, 408 U.S. at 625.

"distinction between the informing function and the legislative function," *Hutchinson*, 433 U.S. at 132 (emphasis omitted), make it difficult to reach that conclusion. The common law's emphasis on a legislator's discretionary power or participation in legislative sessions further weighs against holding that the Clause protects all pre-legislative-act communications with private parties outside Congress. *See Coffin*, 4 Mass. (4 Tyng) at 28–33. The factors used to interpret the Speech or Debate Clause support the conclusion that the Clause does not protect extra-congressional communications and deliberations with private parties about future legislative acts. *See Bastien v. Off. of Senator Ben Nighthorse Campbell*, 390 F.3d 1301, 1319 (10th Cir. 2004) ("The 'communicative processes' referred to in *Gravel* are only those within Congress itself."); *id.* at 1315 ("[C]onstructions of the Speech or Debate Clause have always been confined within the limits of formal, official proceedings."); *Renzi*, 651 F.3d at 1025 ("[P]rivate negotiations between Members and private parties are not protected 'legislative acts' in any case.").

Cuellar relies on *Johnson* to support his argument that the government cannot introduce evidence of a legislator's preparation for legislative acts, such as making a speech in Congress. (Docket Entry No. 115 at 6–7). Cuellar argues that the *Johnson* Court took issue with the prosecution probing "who first decided that a speech was desirable" and "who prepared it." 383 U.S. at 184. Cuellar's reliance on *Johnson* is misplaced because that decision depended on evidence that a legislator spoke in Congress. The Supreme Court stated that the problem was the "attention given to the speech's substance and motivation," 383 U.S. at 176; the "conspiracy theory depended upon a showing that the speech was made solely or primarily to serve private interests," *id.* at 177. The Court noted that the prosecution probed "how much of the speech was written by Johnson himself, how much by his administrative assistant, and how much by outsiders representing the loan company." *Id.* at 173. But the Court did so only to emphasize that the

prosecution had "question[ed] the legislative acts of the defendant member of Congress," *id.* at 185—"the making of the speech," *id.* at 184—and "his motives for performing" it, *id.* at 185; *see also Renzi*, 651 F.3d at 1025.

The Court clarified in *Brewster* that "[t]he question is whether it is necessary to inquire into . . . anything [the legislator] did *in the chamber or in committee* in order to make out a violation of" the bribery statute. *Brewster*, 408 U.S. at 526 (emphasis added). The *Brewster* Court focused on what happened in the congressional chamber, based on the instruction the *Johnson* Court gave in remanding the case that "Johnson could be retried on the conspiracy-to-defraud count, so long as evidence concerning his *speech on the House floor* was not admitted." *Id.* at 528 (emphasis added). The Court explained that if the government chose to retry Johnson on the conspiracy count, he "could not have obtained immunity from prosecution by asserting that the matter being inquired into was related to the motivation for his House speech." *Id.* The Court maintained this reading of *Johnson* over Justice White's statement in his dissent in *Brewster* that this approach would make indictable "statements of intention and undertakings to promote certain policies," including solicitations of input from, and promises made to, voters, donors, and other interest groups in the normal course of campaigning or deliberating over legislation, *see id.* at 557, 556–60 (White, J., dissenting)—the conduct that Cuellar now argues is protected. The Court considered and rejected the reading of *Johnson* that Cuellar advances.

The courts of appeals have done so as well. Most of the courts of appeals permit fact-specific analyses into whether the claimed conduct is integral to the legislative process, while heeding the recognition in *Gravel* that the Clause does not protect criminal acts done in preparation for legislative activity. *See, e.g.*, *Renzi*, 651 F.3d at 1025–26 (citing *Miller*, 709 F.2d at 530); *Lee*, 775 F.2d at 523–24, 524 n.11; *Bruce*, 631 F.2d at 279; *McSurely*, 553 F.2d at 1288; *see also*

*Menendez*, 831 F.3d at 166–68; *United States v. Myers*, 692 F.2d 823, 860 (2d Cir. 1982); *Murphy*, 642 F.2d at 700.  Under these precedents, "[t]he employment of unlawful means to implement an otherwise proper legislative objective is simply not 'essential to legislating.'"  *McSurely*, 553 F.2d at 1288.  "As with taking a bribe, resort to criminal or unconstitutional methods of investigative inquiry is 'no part of the legislative process or function; it is not a legislative act.'"  *Id.* (quoting *Brewster*, 408 U.S. at 526); *see Renzi*, 651 F.3d at 1026 ("[U]nofficial investigations by a single Member are protected . . . [if] no part of the investigation or fact-finding itself constituted a crime" (citing *Miller*, 709 F.2d at 530)).  Although the majority approach to the speech-or-debate privilege is more fact-specific than the Tenth Circuit's, the majority approach does not help Cuellar.  When, as in this case, the alleged communications about future legislative acts with private individuals materially connected to alleged bribe payments occurred at the same time that the legislator was allegedly receiving those bribe payments, (*see* Docket Entry No. 1 ¶¶ 45, 83), the Clause offers no protection, *see Brewster*, 408 U.S. at 502–03 (authorizing a prosecution based on allegations that a legislator "directly and *indirectly*" accepted a bribe (emphasis added)).

*Renzi* is particularly instructive.  In *Renzi*, a grand jury indicted former Arizona Congressman Richard Renzi for offering two private parties *quid pro quo* deals; if the parties would buy land owned by Renzi's former business partner to generate cash to repay a debt the partner owed Renzi, then he would support future public-land exchanges favorable to both.  651 F.3d at 1016.  Renzi asserted immunity under the Speech or Debate Clause, arguing, like Cuellar does, that the indictment alleged "pre-legislative 'negotiations' [that] were a regular and necessary part of the legislative process."  *Id.* at 1023.  The Ninth Circuit rejected this contention, explaining that the Court in *Brewster* took a close look at the alleged "negotiations" and withheld immunity because that conduct, viewed in context, was "uniquely un-legislative."  *Id.*  Accepting the

allegations in the indictment against Cuellar as true, the communications that he argues are protected are, in context, an ongoing and evolving series of offers and requests to perform future legislative acts in exchange for payments, funneled separately through sham contracts. (*See* Docket Entry No. 1 ¶¶ 45, 83).

Cuellar responds that *Renzi* is distinguishable because the record in that case reflected naked negotiations for a bribe, not the type of bona-fide deliberations about policy that he argues are alleged in the indictment. (Docket Entry No. 115 at 8). "Renzi told Aries that if the property was purchased and included, he would ensure that the legislation received a 'free pass' through the NRC," *Renzi*, 651 F.3d at 107; in contrast, Cuellar solicited opinions about whether to co-sponsor legislation, (Docket Entry No. 1 ¶ 83(d)), and prepared and shared talking points and memoranda about bills on which Cuellar would act, (*see id.* ¶¶ 45(b), 83(d), 83(f)). This attempted distinction fails, for two reasons.

First, the indictment alleges express promises similar to the ones at issue in *Renzi*. The indictment alleges that Cuellar told his bribe payors that he would "try [his] best" to block an amendment to a bill, (Docket Entry No. 1 ¶ 45(b) (alterations adopted); *see also id.* ¶ 45(h)); that he would advocate for language expressing a House committee's support for trade with Azerbaijan, (*id.* ¶ 45(d)); that he would add riders and amendments on legislation related to countries that hosted Russian military bases, (*id.* ¶ 45(k)); that he would ask another member of Congress to propose an amendment to a bill, (*id.* ¶ 45(l)); that he would submit certain revisions to a draft committee report, (*id.* ¶ 83(b)), and add language to proposed bills, (*id.* ¶ 83(c)); and that he would "carry" a bill "in the house," (*id.* ¶ 83(f)). These are express "promises to perform legislative acts," which the Clause does not protect. *Helstoski I*, 442 U.S. at 448.

Second, Cuellar's argument is similar to the argument Renzi made and that the Ninth Circuit rejected.  Renzi attempted to distinguish *Brewster* by arguing that "there was no legitimate explanation for Brewster's acceptance of a bribe, and that, unlike Brewster, he ha[d] a legitimate explanation for his deeds."  *Renzi*, 651 F.3d at 1024.  The Ninth Circuit characterized Renzi as arguing that he should have immunity, while Brewster did not, because, "as charged, his deceit was more refined, more sophisticated, than Brewster's."  *Id.*  "Rather than selling his office for cash, [Renzi] was wise enough to at least attempt to conceal his crime by using more indirect means of payment."  *Id.*  The court rejected Renzi's argument as drawing a "distinction without a difference," citing to then-Judge Alito's opinion in *McDade* for support.  *Id.* (citing *McDade*, 28 F.3d at 296 n.16).

Cuellar draws the same distinction, again without a difference.  His attempt to distinguish *Renzi* reduces to an argument that the defendant in that case had "no legitimate explanation" for his conduct, while "he has a legitimate explanation for his deeds"; that "his deceit was more refined, more sophisticated, than [Renzi's]"; and that rather than just "conceal his crime by using more indirect means of payment," he also disguised the alleged offers and acceptances to perform official acts through policy memoranda, talking points, or draft speeches and legislation, providing a greater air of legitimacy to the alleged illicit bargains.  *Id.*  But Paragraphs 45 and 83 of the indictment allege a series of ongoing offers and requests to perform legislative acts, in return for which Cuellar received payment through sham contracts.  The list of allegations that Cuellar challenges includes descriptions of: (1) communications; (2) exchanged between Cuellar and individuals materially related to the entities making the alleged bribe payments; (3) about future votes, legislative proposals, and other legislative acts; and (4) during the same period when Cuellar received the alleged bribe payments.  To adopt Cuellar's argument would turn *Brewster* into a

magic-words test, allowing legislators to sell their votes or other power to influence legislation if they hide bribe payments and dress up illicit promises in policy garb.

Cuellar cannot establish that the speech-or-debate privilege covers the remaining allegations that he challenges. Both history and Supreme Court precedent support the conclusion that the Speech or Debate Clause does not protect private, pre-legislative-act communications and deliberations with third parties outside Congress, especially alleged foreign agents. Narrowly, the Speech or Debate Clause does not privilege illicit conduct "in preparing for or implementing legislative acts," *Gravel*, 408 U.S. at 626, including "[t]aking a bribe," *Brewster*, 408 U.S. at 526; *Helstoski I*, 442 U.S. at 489–490. The challenged allegations fit within this principle because they describe communications about Cuellar's future legislative action, between Cuellar and individuals materially connected to illicit bribe payments. Most of the challenged allegations in the indictment survive constitutional scrutiny.

*     *     *

The court rejects Cuellar's argument that the indictment is facially invalid. The government can make a prima facie case for each of the counts in the indictment without the allegations that Cuellar challenges in his motion. In addition, only five out of the sixteen allegations to which Cuellar objects pose constitutional problems, and those are not fatal to the indictment. The prosecution does not infringe the Speech or Debate Clause.

### B.     The Grand Jury Proceedings

Cuellar also moves to dismiss the indictment on the ground that the government presented legislative-act evidence to the grand jury. (Docket Entry No. 87 at 8–10; Docket Entry No. 105; Docket Entry No. 115 at 13). Cuellar's argument has two problems. First, Cuellar presents the incorrect legal standard for evaluating the validity of grand-jury proceedings. Second, Cuellar

38

does not explain why he succeeds under the proper standard; he does not demonstrate that the legislative-act evidence caused the grand jury to indict him.

Cuellar argues that the substantial presentation of legislative-act evidence to the grand jury automatically warrants dismissal. (Docket Entry No. 115 at 14–16; *see* Docket Entry No. 141 at 7:1–23, 50:19–51:6). The courts of appeals have applied a different standard: dismissal is appropriate if the prosecution presented legislative-act evidence to a grand jury and that "material 'caused the jury to indict.'" *Renzi*, 651 F.3d at 1027; *see Swindall*, 971 F.2d at 1549 ("[W]hen improper evidence is considered by a grand jury, a Speech or Debate violation occurs only if the evidence causes the jury to indict."); *United States v. Helstoski (Helstoski II)*, 635 F.2d 200, 205–06 (3d Cir. 1980) (dismissing an indictment that was a "wholesale violation" of the Clause because the government's charges "rel[ied] on legislative acts or the motivation for legislative acts" (quoting *Brewster*, 408 U.S. at 512)); *United States v. Williams*, 644 F.2d 950, 952 (2d Cir. 1981) (rejecting a speech-or-debate challenge to grand-jury proceedings because the improper evidence "was not a factor in the issuance of the indictment"); *see also Rostenkowski*, 59 F.3d at 1298 (taking issue with a prosecutor's use of legislative acts to "procure an indictment").

The Fourth Circuit splits with its sister circuits, but its rule would not aid Cuellar. The Fourth Circuit held that a district court would not abuse its discretion if it declined to entertain the type of grand-jury-presentation challenge that Cuellar advances. *See United States v. Jefferson*, 546 F.3d 300, 312 (4th Cir. 2008) ("[A] facially valid indictment is not subject to dismissal simply because the grand jury may have considered improper evidence, or because it was presented with information or evidence that may contravene a constitutional privilege.").

"[A]n indictment valid on its face is not subject to challenge on the ground that the grand jury acted on the basis of inadequate or incompetent evidence." *United States v. Calandra*, 414

U.S. 338, 345 (1974). *Calandra*'s holding is not based on the fact that a grand jury is exempt from some of the constitutional limits that apply to other parts of a criminal prosecution. *Calandra* rests on the available "remedies." *Id.* at 354. Excluding evidence at trial is usually the appropriate remedy to protect criminal defendants. *Renzi*, 651 F.3d at 1027 (citing *Calandra*, 414 U.S. at 354). "Because that remedy [of excluding evidence at trial] bears no relation to a grand jury's deliberations, there is no cause to go behind the face of the indictment in ordinary cases." *Id.* However, the Speech or Debate Clause is a different kind of privilege. The Clause prevents a grand jury from "question[ing]" a legislator's "Speech or Debate" because the jurors do so in a "Place" other than a "House" of Congress. U.S. CONST. art. I, § 6, cl. 1. And unlike other evidentiary rules, such as the attorney-client privilege or the Fourth Amendment's exclusionary rule, the Speech or Debate Clause provides immunity from suit. *Eastland*, 421 U.S. at 503. Deferring any remedies to the trial phase is inappropriate. The standard for evaluating a grand-jury presentation must accommodate both the usual rule that a grand jury's assessment of the evidence is unreviewable and the immunity that the Clause affords legislators.

The causation standard accommodates both. The Speech or Debate Clause would "lose[] much of its teeth" if it permitted the government to try against a legislator a case that depended on legislative-act evidence. *Renzi*, 651 F.3d at 1028. But at the same time, "[t]he mere fact that some 'legislative act' evidence was presented to the grand jury cannot entitle [a defendant] to dismissal." *Id.* at 1029. In both *Brewster* and *Johnson*, the Court refused to dismiss the indictments despite concluding that the government presented legislative-act evidence to the grand jury. *See Johnson*, 383 U.S. at 185 (allowing "a new trial . . . wholly purged of elements offensive to the Speech or Debate Clause"); *Brewster*, 408 U.S. at 511–12, 526–27 (reviving an indictment even though it charged the offense as in part linked to the defendant's legislative acts). Those cases clarify that

speech-or-debate violations are not structural errors that give rise to a "presumption of prejudice." *Bank of Nova Scotia v. United States*, 487 U.S. 250, 257 (1988). The causation standard provides an effective middle ground. *See id.* at 256 (holding that, in cases that do not present structural error, "a district court exceeds its powers in dismissing an indictment for prosecutorial misconduct not prejudicial to the defendant"); *see also United States v. Cessa*, 861 F.3d 121, 141 (5th Cir. 2017) (same).

Cuellar argues that *Helstoski II* supports his position that significant use of legislative-act evidence in a grand-jury presentation warrants dismissal. (Docket Entry No. 115 at 14–16; Docket Entry No. 105 at 4–5). Cuellar points to the Third Circuit's admonishment that "[a]ll that is required is that in presenting material to the grand jury the prosecutor uphold the Constitution and refrain from introducing evidence of past legislative acts or the motivation for performing them." *Helstoski II*, 635 F.2d at 206. The facts underlying this admonishment—which is dicta—are distinguishable from those present here. The Third Circuit held that the prosecution committed a "wholesale violation of the speech or debate clause before a grand jury," *id.* at 205, because its charges "rel[ied] on legislative acts or the motivation for legislative acts," *id.* at 206 (quoting *Brewster*, 408 U.S. at 512). In the quote from *Brewster*, the Court discussed *Johnson*'s "unanimous holding," *Brewster*, 408 U.S. at 512, which included its instructions to the district court on remand to hold a new trial on the indictment that previously included allegations of legislative-act evidence, *see Johnson*, 383 U.S. at 185. The Third Circuit interpreted *Helstoski II* as adopting the causation standard. *United States v. James*, 888 F.3d 42, 50 (3d Cir. 2018). No authority supports Cuellar's argument that presenting legislative-act evidence to the grand jury automatically warrants dismissal.

Second, Cuellar does not show that the government's Speech or Debate Clause violations caused the grand jury to indict Cuellar. He briefly presented his grand-jury theory in his motion to dismiss, (Docket Entry No. 87 at 8–11), and asked the government to disclose the grand-jury transcript so that he could evaluate it for Speech or Debate Clause violations, (*id.* at 15–16). The government produced most of the grand-jury materials. Cuellar moved to compel the production of the balance of the grand-jury materials so that he could examine it all for violations. (Docket Entry No. 105 at 3–5). The government opposed Cuellar's motion, arguing that it had already "produced all the evidence presented to the grand jury" but that it would provide transcripts of the remaining "non-evidentiary matter" to the court for "*in camera* review." (Docket Entry No. 111 at 16). Cuellar's reply brief in support of his motion to dismiss argued that the grand-jury presentation violated the Speech or Debate Clause. (Docket Entry No. 115 at 13).

At oral argument, the court questioned the parties on whether they needed additional motion practice to appropriately address the grand-jury issue. (Docket Entry No. 141 at 53:13–54:14). The parties agreed that Cuellar possessed substantially all the evidence presented to the grand jury and that the court had reviewed the balance of the grand jury materials *in camera*. (*Id.* at 48:10–58:10).[6] Cuellar confirmed that he fully raised his issues with the government's grand-jury presentation based on the materials he possessed. (*See id.* at 50:11–12 ("Our motion practice speaks for itself . . . [on] the grand jury issue . . . . It is a part of our reply that we've received

---

[6] The court reviewed *in camera* the government's non-evidentiary presentation to the grand jury on March 5–7, 2024. It also reviewed the proceedings on April 2, 2024, and April 30, 2024, which included both non-evidentiary matters and witness testimony. In addition, the Cuellars asked the court to review the undisclosed portions of the grand-jury record for *Brady* material. (Docket Entry No. 141 at 55:20–58:10). The court did so, concluding that the *in camera* materials contain no information that would materially aid the Cuellars' defense. *See Brady v. Maryland*, 373 U.S. 83, 87 (1963) ("[T]he suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment . . . .").

during the motion practice on the issue.  Those issues are before the Court."); *id.* at 54:3–4 ("[T]he reply incorporated our review of what was produced to us.")).

Based on Cuellar's arguments and the *in camera* review of the balance of the grand-jury materials, the court concludes that although the government presented some speech-or-debate evidence, that evidence did not cause the grand jury to indict.  The grand-jury record contains two errors.  The first error is the same as the one on the face of the indictment; the government presented to the grand jury some communications that refer to several legislative acts Cuellar performed.  (*See, e.g.*, Docket Entry No. 1 ¶¶ 45(a), 45(g), 45(m), 83(b), 83(c)).  *Helstoski I* bars the introduction of these communications.  422 U.S. at 489–90.  The second error is one of the government's instructions to the grand jury.  The government instructed the grand jurors to consider evidence referring to Cuellar's legislative acts, not as proof that Cuellar performed the acts, but only for the purpose of showing the effect it had on the recipients of those communications and other records.  (*See* Docket Entry No. 112 at 3–4 (citing 4/2/24 Tr. at 102:15–23); *see also* Docket Entry No. 103 at 20).   *Helstoski I* rejected this approach to legislative-act evidence, *compare* 443 U.S. at 489–90, *with id.* at 496 (Stevens, J., concurring in part and dissenting in part), and the government erred in relying on then-Judge Alito's similar ruling on evidence of a legislator's status, *see McDade*, 28 F.3d at 290–91, 290 n.9.  The government may not introduce references to Cuellar's legislative acts through post-legislative-act communications.   But these errors did not "raise a substantial question, much less a grave doubt, as to whether they had a substantial effect on the grand jury's decision to charge."  *Bank of Nova Scotia*, 487 U.S. at 263.

The legislative-act evidence was "superfluous," *Renzi*, 651 F.3d at 1031, because the grand jury could still find probable cause to believe that Cuellar committed the alleged crimes without relying on the five references to his legislative acts.  The proper evidence included testimony and

documents showing that Cuellar had received money, funneled to his wife through shell companies, from foreign agents and the entities they represented, and that he and his wife performed little to no legitimate work in return for those payments. (*See* Docket Entry No. 1 ¶¶ 21–44, 46–82). The grand jury also appropriately heard evidence about official, but not legislative, acts that Cuellar performed. (*See, e.g.*, Docket Entry No. 1 ¶¶ 45(f), 45(i), 83(a), 83(e)). This was in addition to the evidence relating to the remainder of the allegations in Paragraphs 45 and 83, which described a back-and-forth exchange of offers and requests to perform future legislative acts during the same period when Cuellar received payments funneled through sham contacts. Cuellar's legislative acts were not "essential element[s] of proof" to the government's case. *Swindall*, 971 F.2d at 1548. "[M]inor references to legislative acts during the grand jury process do not require the dismissal of an otherwise valid indictment." *James*, 888 F.3d at 50.[7]

This is also not a case in which the government emphasized or drew the grand jurors' attention to the few pieces of legislative-act evidence that it presented. The D.C. Circuit anticipated, for example, that a district court might dismiss an indictment if a prosecutor "imflam[ed] the grand jury against a Member upon the basis of his Speech or Debate." *Rostenkowsi*, 59 F.3d at 1298. Under Fifth Circuit precedent, prosecutors may not repeatedly emphasize tainted evidence in closing arguments. *See, e.g.*, *United States v. Alvarado-Valdez*, 521 F.3d 337, 342 (5th Cir. 2008); *United States v. Tirado-Tirado*, 563 F.3d 117, 126 (5th Cir. 2009); *United States v. Jackson*, 636 F.3d 687, 697 (5th Cir. 2011); *United States v. Kizzee*, 877 F.3d 650, 662 (5th Cir. 2017). The court's review of the government's grand-jury presentation, including its

---

[7] The indictment includes allegations that describe communications that "discuss[ed], least in some part, the status of actual legislation." *Renzi*, 651 F.3d at 1031. Cuellar does not argue that references to existing or pending legislation, as distinct from legislative acts he performed, violate the Speech or Debate Clause. Nor does Cuellar argue that those references to existing or pending legislation caused the grand jury to indict him.

presentation of the indictment to the grand jury, reveals no inflammatory remarks or repeated emphasis on Cuellar's legislative acts. The government's treatment of Cuellar's legislative acts hewed closely to its treatment of the evidence in the indictment. The record discloses no inappropriate or disproportionate emphasis on the inadmissible legislative-act evidence that warrants dismissing the indictment.

Cuellar does not identify prosecutorial misconduct in the grand-jury materials that warrant dismissal. Cuellar's only reference to the grand-jury record takes issue with the government's request that a witness testify without revealing the contents of certain documentary exhibits. (Docket Entry No. 114 at 13). Cuellar argues that this exchange shows the government's knowing violation of the Speech or Debate Clause. (*Id.* at 13–14).

This argument is not persuasive, for two reasons. First, this exchange and other discussions during the grand-jury proceedings show the government's awareness of the Speech or Debate Clause's limits on evidence, but they do not show that the government acted in bad faith. The court has identified discrete errors that government made in instructing on the Clause and in presenting evidence of legislative acts. These errors appear to be based on a plausible, although incorrect, reading of the case law and do not warrant dismissal. *See, e.g.*, *Renzi*, 651 F.3d at 1031–32; *Brewster*, 408 U.S. at 526–29; *Johnson*, 383 U.S. at 185. Second, Cuellar does not cite authority supporting dismissal as the required remedy. A court can remedy errors in applying the Speech or Debate Clause "adequately by means other than dismissal," including through "contempt of court," directing "a prosecutor to show cause why he should not be disciplined and request the bar," or "chastis[ing] the prosecutor in a published opinion." *Bank of Nova Scotia*, 487 U.S. at 264. Cuellar does not explain why this record would justify any of these steps, much less require dismissal of the indictment.

IV.    **Conclusion**

The motion to dismiss the indictment for violating the Speech or Debate Clause, U.S. CONST. art. I, § 6, cl. 1, is denied.  (Docket Entry No. 87).

The Cuellars' motion to compel the production of the complete grand-jury record is denied. (Docket Entry No. 105).

SIGNED on September 19, 2025, at Houston, Texas.

_____
Lee H. Rosenthal
Senior United States District Judge